347 So.2d 933 (1977)
Ruth S. DaROCA
v.
ST. BERNARD GENERAL HOSPITAL and its staff, Dr. Emile A. Bertucci, Dr. Hewitte A. Thian, Dr. Ernest J. Delahaye, Dr. Robert E. Mayfield, Professional Insurance Company of New York and St. Paul Fire and Marine Insurance Company.
No. 7828.
Court of Appeal of Louisiana, Fourth Circuit.
June 30, 1977.
George P. Vedros, Gretna, for plaintiff-appellee and appellant.
Dale, Owen, Richardson, Taylor & Matthews, Carey J. Guglielmo, Baton Rouge, for St. Bernard General Hospital, defendant-appellant and appellee, Dr. Hewitte A. Thian and Dr. Emile Bertucci, Jr., defendants-appellees.
Lemle, Kelleher, Kohlmeyer & Matthew, William S. Penick, New Orleans, for Dr. Ernest J. Delahaye, Dr. Robert E. Mayfield, and St. Paul Fire & Marine Ins. Co., defendants-appellees.
Before LEMMON, STOULIG and SCHOTT, JJ.
LEMMON, Judge.
In this medical malpractice case St. Bernard General Hospital has appealed from a judgment following a jury verdict, which awarded plaintiff damages for loss of hearing as a result of a drug reaction. In answering special interrogatories, the jury found that the hospital and the four named doctors were negligent, but further found that the doctors' negligence did not cause plaintiff's damages. Plaintiff has also appealed, questioning the dismissal of the doctors.
The critical issues on appeal are (1) whether an excessive dosage of neomycin, a drug with possible toxic effects on auditory function, was prescribed and administered in postoperative treatment after a colon resection and (2) whether excessive dosage of neomycin caused the loss of hearing.

I
By proctoscopic examination of plaintiff, one doctor of the three-member St. Bernard Medical Group found a pre-malignant growth six to eight inches inside the colon and called in Dr. Hewitt Thian as a surgical consultant. When Dr. Thian recommended surgery, plaintiff expressed a strong desire *934 to avoid a colostomy unless absolutely necessary. Because colon resection (removal of a section of bowel and union of the two ends, as opposed to rerouting by colostomy) involved unavoidable leakage of fecal matter in the peritoneal cavity and consequent danger of peritonitis, Dr. Thian ordered that neomycin be administered orally for bowel preparation prior to the surgery.[1]
Dr. Thian performed the surgery on July 28, 1972 and fortunately was able to avoid a colostomy. He then ordered that neomycin solution be instilled periodically into a catheter leading to the site of the anastomosis (surgical union of the bowel), with a drain tube leading from the same site. Three grams of neomycin were accordingly administered daily over the next four days (through July 31). During that period there was no sign of infection, and tests indicated plaintiff's kidneys functioned normally.[2]
Eight days after the neomycin was stopped, however, plaintiff's wound opened during a coughing spell, and Dr. Thian performed a secondary closure as an emergency procedure. Plaintiff thereafter developed peritonitis and became critically ill, whereupon her family transferred her to another hospital with an intensive care unit. After extensive treatment and medication, including two other ototoxic drugs, she completely recovered except for an almost total loss of hearing.
This suit seeks damages for that loss on the basis that the prescribed dosage exceeded the recommended maximum for intraperitoneal instillation.

II
A physician has a duty not to prescribe a higher dosage of a dangerous drug than is reasonably necessary to control the patient's condition under the circumstances. The pertinent inquiry in this case is whether the prescribed dosage was reasonably necessary.
All witnesses agreed that peritonitis was the primary concern as a surgical complication, especially in a lower anterior resection of the colon, and that the broad-spectrum antibiotic, neomycin, was the drug of choice to control peritonitis, which it in fact did. Furthermore, there was general agreement that increased dosage, while more effective in preventing infection, also increased the risk of ototoxicity, although an effect on hearing could occur with small doses.
To prove the dosage was higher than reasonably necessary, plaintiff presented an expert pharmacologist and excerpts from three recognized reference books. The pharmacologist testified that for prophylactic use he would have started with the recommended maximum dosage of one gram per day (which he opined was generally enough to prevent infection) and would have increased the dose if infection developed. He admitted, however, that peritonitis is a serious and dangerous condition which is difficult to control and that it is easier to prevent an infection than to cure an infection which has already developed.
Two of the reference books did not list the recommended dosage for intraperitoneal instillation. The third contained the following statement:
"For intraperitoneal instillation a 0.5 to 1 percent solution of neomycin in sterile water or normal saline is used. For adults, no more than 100 ml. of solution or 1 Gm. of antibiotic should be instilled per day for 1 to 3 days. The 3-day limit on duration of dosage must not be exceeded."
Dr. Thian testified that he was aware of the recommended dosage, but defended the dosage he prescribed on two bases. First, he asserted that the reference books were merely guidelines intended to assist physicians in exercising medical judgment in given circumstances. Second, he contended that he used an "irrigation dosage" which *935 did not really exceed the recommended maximum, since a major portion of the drug, used as a lavage in this area (which is not an open space, but is filled with intestines), runs out through the drain and is not absorbed.[3]
An expert surgeon corroborated this view, differentiating as to the latter concept between this method of irrigation, in which a drain is used and perhaps 80% of the drug runs out through the drain, and a method in which no drain is used and the skin is closed over the wound after instillation of the catheter. Stating that he would have used "a lot more" as long as renal function was normal, the surgeon emphasized that the method of irrigation and the drug dosage are matters of surgical judgment under the circumstances (a view also conceded by plaintiff's pharmacologist).[4] He further testified that he had used neomycin in surgery about 2,000 times over 12 years without one case of hearing loss. And a specialist in colon-rectal surgery with 40 years of experience confirmed that ototoxic reaction to neomycin was extremely rare.

III
The jury verdict as to the doctors, finding negligence without causation, is puzzling.[5] Nevertheless, we do not reach the question of how much weight to accord the arguably inconsistent verdict, since we find the evidence does not support a conclusion that medical malpractice occurred.
The risk of peritonitis (with the attendant high fatality rate in cases of generalized peritonitis) from this particular serious and difficult surgery was very high, while the risk of toxic effects on auditory function was very minimal. The surgeon (especially when heeding the patient's solicitation to avoid a colostomy) was called upon to balance antibacterial benefits against pharmacological risk. The record does not establish that, in doing so, he violated prevailng medical standards. This is not to say that a surgeon can recklessly disregard potential dangers from drugs when the risk is slight; rather, a surgeon in prescribing any drug must exercise reasonable discretion in consideration of all relevant factors. Plaintiff has simply failed to prove that reasonable discretion was not exercised in this case.
Accordingly, the judgment is reversed, and it is now ordered that plaintiff's suit be dismissed. Each party is to bear its own costs.
REVERSED AND RENDERED.
NOTES
[1] It is undisputed that neomycin was properly used for preoperative care, since it sterilizes the intestine but is not absorbed in significant amounts in the blood stream.
[2] Since normally functioning kidneys eliminate drugs by excretion, the drug level will build up if renal function is impaired.
[3] Only one expert (the pharmacologist, who was not a surgeon) opined that less than 50% of the drug would come out through the drain, and he stated the amount would depend upon the type, location and length of the tube.
[4] Renal function was normal until the wound eviscerated on August 8.
[5] This portion of the verdict is perhaps attributable to a notion that the surgeon was negligent in exceeding the recommended dosage, but that the deafness (which the doctors claim was not reported to them during plaintiff's stay at St. Bernard and which plaintiff admitted not knowing when it began) was more probably caused by drugs at the second hospital after non-negligent occurrence of the evisceration.