Judge Regina Bartholomew-Woods
| garleen Levy and Darleen M. Jacobs, A Professional Law Corporation (collectively, “Plaintiffs”), appeal the judgment of the Orleans Parish Civil District Court dated January 29, 2016, rendering judgment in her favor against Jessica A. Lewis, Steakhouse New Orleans, L.L.C. (“Steakhouse”), Maryland Casualty Company (“Maryland”), and Progressive Security Insurance Company (“Progressive”) (collectively, sometimes referred to as, “Defendants”).
For the reasons that follow, we reverse the judgment of the trial court and remand this matter for a new trial,
FACTS AND PROCEDURAL HISTORY
On May 16, 2011, at approximately 10:30 a.m., Darleen Levy was operating her 2011 Lexus GS350 Sedan. While traveling in an easterly direction on St. Charles Avenue, in the City of New Orleans, Louisiana, her vehicle was struck from behind by a 2005 Chevrolet 1500 pick-up truck. The truck was owned by Steakhouse New Orleans, LLC and being operated by its employee, Jessica Lewis.
Plaintiffs’ initial petition for damages was filed in Orleans Parish Civil District Court on March 13, 2012. Plaintiffs subsequently filed a first supplemental Land amending petition, naming Ms. Lewis, Steakhouse, Steakhouse’s insurance carrier, Maryland, and Ms. Levy’s Uninsured/Underinsured (UM/UIM) insurance carrier, Progressive, as Defendants. Maryland and Progressive are both foreign corporations.
On May 16, 2013, Plaintiffs filed a second supplemental and amending petition asserting a bad faith claim against Progressive as Ms. Levy’s UM/UIM carrier. On August 22, 2014, Progressive filed a motion for partial summary judgment seeking dismissal of Plaintiffs’ bad faith claim, without prejudice. On October 8, 2015, Progressive filed a supplement to its *1153 request for relief seeking dismissal of Plaintiffs’ bad faith claim, with prejudice.
Plaintiffs claimed multi-million dollar economic losses as supported by Ms. Levy’s federal income tax returns. Also included within Ms. Levy’s tax returns were references to her income from other sources, referred to as “passive” or “unearned” income. Plaintiffs filed a motion in limine and supporting memorandum seeking to prohibit Defendants from directly or indirectly presenting any testimony, making any statements or argument, or introducing any evidence concerning her passive income, specifically, her real estate holdings, stock holdings or wealth. Defendants opposed.
On October 16, 2015, the trial court held a hearing on the various pre-trial motions filed by both Plaintiffs and Defendants. In a Judgment dated November 9, 2015, the trial court denied, in relevant part, Plaintiffs’ motion in limine to preclude references to her passive income. The trial court also granted Progressive’s motion for partial summary judgment on Plaintiffs’ bad faith claim, with prejudice. Finally, the trial court denied the Defendants’ Daubert motion to strike Plaintiffs’ economic expert. It further ordered Plaintiffs to provide to ^Defendants a calendar showing Ms. Levy’s trials for the two-year period prior to and all years after the accident, as well as all settlements Plaintiffs reached during the same time period.
On application for supervisory writ, this Court reversed that portion of the ruling dismissing the bad faith claim asserted against Progressive, with prejudice. Levy, et al v. Lewis, et al, 15-1303 (La.App. 4. Cir. 1/15/16).
A jury trial on the merits proceeded on January 19, 2016. On January 29, 2016, the jury rendered its verdict, finding the negligence of defendant, Jessica Lewis,' to be the proximate cause of Plaintiffs’ injuries and damages. The jury awarded Ms. Levy $30,000 for physical pain and suffering, past, present, and future; $10,000 for mental anguish and' suffering, past, present, and future; $7,500 for loss of life’s enjoyment, past, present, and future; and $14,000 for past medical expenses, for a total of $61,500. The jury awarded no damages for permanent injuries and disability or loss of income. The final judgment was signed February 25,2016.
Plaintiffs now appeal, alleging five assignments of error. In light of our ultimate ruling, we address only a portion of assignment of error number one, assignment of error number four, and a portion of assignment of error number five. Progressive also appeals, seeking 'amendment of the judgment insofar as it failed to include judgment in its favor for $5,000 made to Ms. Levy in medical payments under her policy, despite her failure to prove that her damages exceeded the limits of the liability policy. Again, in light of our ruling, the latter matter will need to be addressed on remand.
| ASSIGNMENTS OF ERROR
ASSIGNMENT OF ERROR NO. 1
In their first assignment of error, Plaintiffs argue that the trial, court erred in refusing to exclude certain evidence. In part, Plaintiffs argue Ms. Levy did not allege nor was she claiming a loss of passive, or “unearned,” income as a result of the accident, and therefore, evidence of her personal wealth and passive income was irrelevant to her claim of loss of income from her work as an attorney.
In challenging evidentiary rulings, Plaintiffs bear the burden of showing that a “substantial right” was affected. La. C.E. art. 103(A). Plaintiffs rely on Rodriguez v. Traylor, 468 So.2d 1186, 1188 (La.1985), which held “that the wealth or poverty of a party to a lawsuit is not a proper consider *1154 ation in the determination of compensatory damages. Each litigant should stand equal in the eyes of the law regardless of his financial standing.” Ms. Levy contends that all claims are for wages lost through her inability to earn wages through her labor as an attorney, and her passive income was irrelevant in light of Rodriguez. Ms. Levy further argues that passive income from investments is not considered “wages” or “earned income” as a matter of law, noting that this Court, in Iles v. Ogden, 09-0820, p, 3 (La.App. 4 Cir. 2/26/10), 37 So.3d 427, 432 n. 4, found passive income to be “unearned” income.
Defendants respond that this issue is settled by the “law of the case” doctrine as a result of this Court’s previous denial of Plaintiffs’ supervisory writ raising the same error. Levy, et al v. Lewis, et al, 15-1303 (La.App. 4. Cir. 1/15/16). However, this Court is not persuaded by such an argument. “A denial of supervisory review is merely a decision not to exercise the extraordinary powers of supervisory | ¿jurisdiction, and it does not bar consideration on the merits of the issue denied supervisory review, when appeal is taken from final judgment.” State v. Fontenot, 550 So.2d 179, 179 (La.1989). “Thus, the ruling denying supervisory writs does not bar reconsideration of the issue on appeal and there reaching a different conclusion as to it.” Id.
Defendants additionally argue the evidence was admitted for permissible purposes. Specifically, Defendants assert such evidence was submitted to show that Ms. Levy continued to work as vigorously after the accident as before, to include even work unrelated to her law practice. Furthermore, Defendants submit that there was never any mention of her specific wealth from these sources, and that Plaintiffs failed to- cite to any portion of the transcript in which Defendants discussed her passive income. Finally, Defendants assert that Ms. Levy opened the door to the introduction of her passive income.
We agree that evidence of an individual’s passive income which is not relevant to a claim of lost wages should not be introduced to a jury. We find that the trial court’s reasoning in denying the motion in limine regarding passive income unpersuasive; the trial court reasoned that “Ms. Levy’s ability to earn income from other businesses may be probative of the extent to which the accident sued upon affected her loss of earning capacity;” In reaching this conclusion, the trial court ignored the fact that Plaintiffs were not alleging any loss other than as it pertains to her ability or inability to practice law. Thus, any other passive income was irrelevant and injected prejudicial error against the Plaintiffs.
Despite Defendants’ assertions, the inclusion and/or the introduction of passive income was first determined when the trial court erroneously denied Plaintiffs’ motion in limine wherein they sought to exclude any and all 16references/evidence of Plaintiffs’ passive income. Plaintiffs never made a loss of wage claim due to Ms. Levy’s passive income. Plaintiffs’ loss of wage claim arose exclusively from Ms. Levy’s ability to earn wages as an attorney. While Plaintiffs did indeed introduce Ms. Levy’s tax returns evincing her passive income, the trial court’s pre-trial ruling necessarily prevented Plaintiffs from redacting the prejudicial information contained therein. Thus, the trial court committed error in allowing references and evidence of Plaintiffs’ passive income to be introduced to the jury. ,
Furthermore, Defendants made references to the introduction of Plaintiffs’ tax returns and W-2s during opening statements. Such references required Plaintiffs’ counsel to address the issue on direct examination of Ms. Levy. The jury would surely observe her passive- income in her *1155 returns and W-2s. Thus, it cannot be said that Plaintiffs opened the door to this issue, when Defendants indicated their intent to address Ms. Levy’s passive income through pre-trial motion practice and during opening statements.
Moreover, on cross-examination, Defendants indeed inquired into the passive income issue in the context of a post-accident magazine article profiling Ms. Levy as a “Super Lawyer.” Counsel for Steakhouse asked whether she had stated in the article that she had little spare time because of her busy work schedule, due in part to her work as a real estate broker and property manager and operator. Counsel asked whether she still had a substantial interest in those management companies, which she acknowledged. Counsel also asked her whether she was involved in the development of a “multimillion | ydollar” gas station project, which she acknowledged, though disputing that it was indeed a “multimillion dollar” project. Counsel for Ms. Levy did not object at the time of the questioning, though Ms. Levy did raise an objection on her own later in the proceedings.
Counsel for Progressive also inquired as to Ms. Levy’s non-legal enterprises. She was asked whether she kept busy running three business, to which she responded “I have people that run [two of] them[,]” meaning her non-legal endeavors.' Counsel pointed her to her deposition, in which she stated “Isn’t it enough businesses to run? Do you want me to run another one?” Counsel then referred to the tax returns Plaintiffs submitted into evidence, which indicated her ownership of numerous rental properties. Counsel also questioned Ms. Levy about losses on the properties prior to the accident compared to gains after the accident reflected in the tax returns, while, in counsel’s words, Ms. Levy was “overseeing or running” those properties. Ms. Levy explained that many of the properties had to be repaired after - Hurricane Katrina, which is why the gains were reflected in later years.
Loss of earning capacity and lost wages are distinguishable claim's. In Finnie v. Vallee, 620 So.2d 897, 900-01 (La. App. 4 Cir. 1993) (footnote omitted) this court stated:
Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person’s , potential. Earning capacity is not necessarily determined by actual loss. While the plaintiffs earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiffs lost ability to earn a certain amount, and he may recover such, damages even though he may never have seen fit to take advantage of that capacity. Hobgood v. Aucoin, 574 So.2d 344, 346 (La.1990). The trial court should consider whether and how much the plaintiffs current condition disadvantages him in the work force. The trial court, should thus ask itself what the plaintiff might be able to have earned but for his injuries and what he. may now. earn given his resulting condition.
I «The trial court considered Ms. Levy’s ability, or capacity, to earn-income generally as a basis to challenge her specific claim of lost income as an attorney. Because Plaintiffs sought only lost future income for Ms. Levy as an attorney, the trial court erred in allowing Defendants to inquire as to her passive income.
ASSIGNMENT OF ÉRRÓR NO. 4
Plaintiffs’ fourth assignment of error argues that the -trial court' erred in granting Defendants’ motion for a directed *1156 verdict regarding future medical expenses. In support of this argument, Plaintiffs cite Youn v. Mar. Overseas Corp., 623 So.2d 1257, 1262 (La. 1993), which held:
In Stiles v. K-Mart Corp., 597 So.2d 1012 (La.1992), plaintiff proved that he would require future medical treatment, but did not present expert testimony as to the cost of the treatment. The court of appeal deleted the trial court’s award for this item of damages, but this court reinstated the award, noting:
When the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required. La.Code of Civ.Proc. art. 2164.
597 So.2d at 1013.
Ms. Levy testified that at the time of trial, she was seventy-one years old. She explained that she was born with Von Wil-lebrand disease, a bleeding disorder that could render surgery fatal. She acknowledged that she was rear-ended in a prior motor vehicle accident in 1988, injuring her neck and back. She unsuccessfully treated her injuries for months, ultimately opting for surgery in 1990. .She testified that as a result ■ of her Von ■ Willebrand disease, she hemorrhaged, blacked out, and was “out of it” for three days. Ms. Levy claimed |Bthat after her surgery in 1990, she was in good health and that her work was unaffected. Between 1990 and the 2011 accident, she claimed her only health issues were kidney stones for a period, having her gall bladder removed, and a 2001 knee surgery due to an exercising injury.
On the date of the accident, May 16, 2011, Ms. Levy stated she was sitting in traffic when she was struck from behind. She said her head hit the visor and her chest hit the steering wheel. She also testified that her seat back collapsed and twisted to such an extent that it had to be replaced. She said she blacked out and thought she was having a heart attack. She ultimately went to the emergency room for treatment.
She testified that she began subsequent treatment a few days after the accident with Dr. George Murphy, an experienced physician board certified in orthopedic surgery, with whom she treated up to trial. She complained of a “severe headache,” and claimed her head was still red from hitting her visor. She also claimed to be experiencing neck, chest, and back pain. Dr. Murphy gave her medication and referred her to other professionals for more specific treatments and to explore other options, since he no longer performed surgical procedures.
At the time of trial, Ms. Levy stated she experienced pain like a “hot poker” going down her spine, and also felt pain in both her legs and arms. She also testified to her difficulty in making fists with her hands. She explained that she takes a Medrol Dosepak every two months as well as Ce-lebrex to treat her pain. Her neurosurgeon, Dr. Rand Voorhies, referred her to a Dr. Martinez, who gave her one steroid injection. She also saw Dr. Daniel Lund-gren, who raised the option of a morphine pump to manage her pain. However, Ms. Levy stated that she is allergic to morphine.
1inMs. Levy did indeed testify that she wanted to get better and wanted surgery for that purpose. However, she acknowledged that Dr. Voorhies did not recommend any surgery due to her Von Willeb-rand disease, as it would be too dangerous *1157 because if she were to hemorrhage it could be fatal. She described the surgery and even added that Dr. Voorhies “doesn’t think it would do me any good.”
She also described treatment with Doctors Barczyk and Kruse, her chiropractors. She testified that she has received several treatments of “dry needle surgery” from Dr. Kruse.
Plaintiffs called several medical experts to testify regarding Ms. Levy’s prognosis. The first was Dr. George Murphy, who explained that her susceptibility to bleeding limited her treatment options. At least initially, he did not recommend physical therapy for Ms. Levy, only medication arid rest. Accordingly, throughout his treatment of Ms. Levy, he has prescribed anti-inflammatory medications, provided cortisone injections, and removed fluid from her knee. He also testified that her magnetic resonance imaging (“MRI”) revealed degenerative disc disease and herniation. He also referred her to Dr. Tarun Jolly, who gave her epidural steroid injections, but an allergic reaction required termination of that particular treatment option. As her treating physician up through trial, Dr. Murphy was also able to testify that the only medications that were successful with Ms. Levy were Celebrex and cortisone pills. He also testified that she would probably be seeing a doctor to treat her pain indefinitely.
Next, Plaintiffs called Dr. Eduardo Rodriguez, an expert in internal medicine. He had been treating Ms. Levy since 2000. He noted her 1990 and 2001 surgeries. He also described a 2004 bone scan which revealed some degenerative |T1changes. Ms. Levy also had a history of kidney stories and even reported some chest pain in the week prior to the accident. However, Dr. Rodriguez testified that Ms. Levy did not report any neck or back pain prior to the 2011 accident.
Plaintiffs called David Barczyk, a doctor of chiropractic. He described himself as.a physician, but he does not treat with medication or surgery. He also described himself as an injury biomechanist, which involves the study of how the body reacts to forces such as an automobile collision. Ultimately, Dr. Barczyk recommended Ms. Levy see a chiropractor or a physical therapist, and acknowledged her inability to get surgery. He therefore suggested she “undergo some type of manual therapy to strengthen her body some.”
Plaintiffs also called Dr. Rand Voorhies, an experienced, board certified neurosurgeon, admitted as an expert. He began treating Ms.' Levy in May of 2013. He reviewed Ms. Levy’s MRIs from the accident, as well as those from her previous automobile collision in 1992. He testified that the appearance of the cervical and lumbar MRIs was “dramatically different” from 1992 to 2011. He stated that Ms. Levy’s Von Willebrand disease “can impact” whether or not she would be a candidate for surgery. He explained his “hope” that Ms. Levy could resort to non-surgical treatment. He also suggested a treatment whereby Ms. Levy’s nerve endings could be burned as a means to dull her pain on a short-term basis. He did not suggest the morphine pump, as that treatment option was more for those who “have a relatively short life expectancy.” He described fusion surgery as a “whopper” and that there were concerns regarding that option.because of her Von Willebrand disease, though he did say it could be a “viable option” depending on what a hematologist would suggest.
| ^Defendants also offered their own medical expert testimony to contradict that of Plaintiffs. Defendants called Dr. Deepak Awasthi, a board certified neurosurgeon, admitted as an expert. He conducted an independent medical exam of Ms. Levy. *1158 He.also reviewed her emergency room records and MRIs from after the accident, and he was aware of her 1990 surgery. In his opinion, the MRIs from just weeks after the accident did not reveal any acute injury from the- accident, but rather reflected chronic deterioration and' degeneration.
Plaintiffs note that Ms. Levy testified at trial about ongoing neck and back pain and issues with her ability to fully close her hands as a result of the accident. She testified that she wants to get better, and Plaintiffs suggest in their brief that her doctors recommended a morphine pump and surgery. In a related assignment of error, Plaintiffs submit Ms. Levy will need lumbar fusion and cervical fusion surgeries.
An award of future medical expenses was discussed by this court in Joseph v. Archdiocese of New Orleans, 10-0659, p. 6 (La.App. 4 Cir. 11/10/10), 52 So.3d 203, 207:
We review the jury’s award for Mr. Joseph’s future medical expenses, which is an item of special damage, under the manifest error standard of review. “Future medicals need not be established with mathematical certainty although a plaintiff must prove that it is more probable than not that expenses will be incurred[” ... ] and “some evidence to support the award must be contained in the record.” Molony v. USAA Property and Casualty Ins. Co., 97-1836, pp. 2-3 (La.App. 4 Cir. 3/4/98), 708 So.2d 1220, 1221 (citations omitted). The Louisiana Supreme Court in Duncan v. Kansas City Southern Railway Co., 00-0066, p. 17 (La. 10/30/00), 773 So.2d 670, 685, stated: “Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost.” The plaintiff must show that future medical expenses more probably than not will be incurred, he must show that they are needed, and he must supply estimates of their probable cost. Abuan v. Smedvig Tankships, Ltd., 96-1013, p. 21 (La.App. 4 Cir. 6/24/98), 717 So.2d 1194, 1205.
11sThe posture of this case is different from that of Joseph, however. The trial court granted Defendants’ motion for a directed verdict, based on Plaintiffs’ failure to- give “some idea of what [future care] costs.” Later in the proceedings, the trial court appeared to admit an error in that regard, stating “I should not have granted the directed verdict without giving [Plaintiffs] a chance to respond to it.” Nevertheless, the court ruled that its prior ruling granting the motion for a directed verdict would stand.
The standard of review in such context was set forth by this Court in Everhardt v. Louisiana Dep’t of Transp. & Dev., 07-0981, pp. 13-14 (La.App. 4 Cir. 2/20/08), 978 So.2d 1036, 1047:
The standard of review on appeal of a directed verdict is whether reasonable persons could not reach a contrary verdict under the evidence. Davis v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 03-2219, pp. 7-8 (La.App. 4 Cir. 11/17/04), 887 So.2d 722, 727. The question to be asked by the appellate court" is not whether a plaintiff proved his case by a preponderance of the evidence, but rather, whether upon reviewing the evidence submitted, the, court could conclude that reasonable. persons could not have reached a verdict in favor of the plaintiff. Id. The appellate court must also determine -if the -record supports the granting of a directed verdict, based not on a credibility .determination (a factual issue), but on a sufficienoy-of-evidence determination (a question of law). Id.; Lott v. Lebon, 96-1328, p. 4 (La.App. 4 Cir. 1/15/97), 687 So.2d 612, *1159 616. A directed verdict must be sustained on appeal where the reviewing court would find a jury verdict in favor of the party opposing the motion-to be manifestly erroneous had the- trial judge allowed the case to go to the jury. Wichser v. Trosclair, 99-1929, p. 5 (La.App. 4 Cir. 2/28/01), 789 So.2d 24, 27. The court of appeal considers the evidence under the substantive law applicable to the nonmoving party’s claim. Tanner v. Cooksey, 42,010, p. 6 (La.App. 2 Cir. 4/4/07), 954 So.2d 335, 339.
First, we note Plaintiffs’ suggestion in their brief that Ms. Levy’s doctors recommended a morphine pump and surgery directly contradicts representations made at trial. Indeed, in arguing against the motion for directed verdict, Ms. Levy’s counsel stated:
_|_yThere definitely was testimony from Dr. Murphy- on future prognosis. His recommendation is that Ms. Levy continue to treat with him like she has over the past five years or so. I think that the jury can easily put a number on that because it’s essentially the same thing with him that has been happening for the past five years,
I would agree on the future surgery which she’s not going to have -and we’re not arguing to the jury she is going to. We’re not arguing to the jury she’s getting a morphine pump. I think it’s been made clear to - the jury that she’s not a candidate for either of those things.
■ But as far as her continuing prognosis and her continuing need to treat with Dr. Murphy, there’s plenty of evidence in front of the jury about what that is, what that has cost in the past, and I think we- can ask the jury to make a determination about what that will cost in the future.;,
By Plaintiffs’ own admission, they did not intend to seek future medicals regarding a surgery that was not recommended by any of her medical experts given her Von Wil-lebrand disease. Only Dr. Voorhies suggested it could be “viable” based on a hematologist’s recommendation, but no evidence was provided by Plaintiffs in that regard. Ms. Levy, herself acknowledged that Dr. Voorhies “hasn’t recommended anything” for her. Based on her conversations with Dr. Voorhies, Ms. Levy understood that “[i]t would be a very dangerous surgery. [Dr. Voorhies] doesn’t think it would do me any good, and he’d be afraid that I would hemorrhage, because if I started to hemorrhage it.could be fatal.” Ms. Levy is allergic , to morphine—a drug most often used, according to Dr. Voor-hies, for patients near death to manage pain—clearly eliminating a morphine pump from the realm of legitimate treatment options.
Notwithstanding the aforementioned testimony and representations, this Court does recognize that Dr. Murphy, Ms. Levy’s treating physician, who provided medical treatment to Ms. Levy up through the trial, testified that as a- result of the pain Ms. Levy is experiencing from the accident, Ms. Levy will be | ^treating with him indefinitely. He has prescribed pain and anti-inflammatory medications, removed fluid from Ms. Levy’s knee, and provided cortisone injections. He also referred her to other medical, experts for more tailored treatment.
Contrary to thé tria} court’s statement that Plaintiffs did not provide evidence of what future care might cost, Plaintiffs did introduce Ms. Levy’s medical records from Dr, Murphy, which included three pages of billing statements from May 19, 2011, through December 16, 2016, totaling forty visits at a cost of $4,165. Dr. Murphy also testified that Ms. Levy was originally seeing him on a monthly basis, but in the year prior to the trial, her records reflect she visited him five times. Thus, the jury was *1160 provided information that could have been used to determine an award of future medical expenses had the trial court not improperly granted the directed verdict.
ASSIGNMENT OF ERROR NO. 5
Plaintiffs’ fifth assignment of error argues Ms. Levy was denied all of her actual damages, to wit, her past medical expenses and lost future wages. Plaintiffs further assert the general damages award was “abusively low” in light of her proven injuries and medical treatment.

Special Damages

This court, in Watson v. Hicks, 15-0046, p. 21 (La.App. 4 Cir. 5/27/15), 172 So.3d 655, 672, addressed the standard to be applied in evaluating an award of special damages:
Special damages are defined as “those which either must be specially pled or have a ‘ready market value,’ i.e. the amount of damages supposedly can be determined with relative certainty.” Wainwright v. Fontenot, 00-0492, p. 5 (La. 10/17/00), 774 So.2d 70, 74. Certain types of special damages, including medical expenses, are |16easily measured. Smith v. Escalon, 48,129, p. 10 (La.App. 2 Cir. 6/26/13), 117 So.3d 576, 583. A plaintiff is required to prove special damages by a preponderance of the evidence. Mack v. Wiley, 07-2344, p. 14 (La.App. 1 Cir. 5/2/08), 991 So.2d 479, 489. The standard of review applicable to an award of special damages is the manifest error standard. Kaiser v. Hardin, 06-2092, pp. 11-12 (La. 4/11/07), 953 So.2d 802, 810.
Furthermore, this Court discussed the “manifest error” standard in State Farm Mut. Auto. Ins. Co. v. LeRouge, 07-0918, pp. 15-16 (La.App. 4 Cir. 11/12/08), 995 So.2d 1262, 1274-75:
It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. When findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong standard demands great deference to the trier of fact’s findings, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where documents or objective evidence so contradict a witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder’s finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, supra, 549 So.2d 840, 844-845 (La. 1989).

Special Damages—Past Medical Expenses

In order to collect past medical expenses, Plaintiffs bore the burden of proving it more probable than not that Ms. Levy’s injuries, and treatments therefor, were caused by the accident in question. See Williams v. Mathieu, 13-1373, p. 2 *1161 (La.App. 4 Cir. 10/29/14), 155 So.3d 54, 57. However, this Court has previously | ^acknowledged the governing principle that past medicals, evidenced by a bill and incurred in good faith, are recoverable even under circumstances when such treatment could be viewed as unnecessary. Watson v. Hicks, 15-0046, pp. 25-26 (La. App. 4 Cir. 5/27/15), 172 So.3d 655, 675.
Plaintiffs’ own witness, Dr. George Murphy, acknowledged that Ms. Levy’s MRIs taken soon after the accident revealed “considerable degenerative disease.” Degenerative disc disease, he explained, is “especially” caused by aging, though injury can also be a cause. He further noted that trauma can aggravate the condition. There was also testimony regarding Ms. Levy’s prior motor vehicle accident in 1988, which gave rise to injuries similar to those alleged from the 2011 accident, and which ultimately required surgery in 1990. On cross-examination of Ms. Levy, it was revealed that Ms. Levy had filed a lawsuit against the other driver in the 1988 accident, and filed a pleading in 1994 requesting a continuance of the trial date because she would be receiving “additional surgery as a result of the accident.” Dr. Rodriguez further noted Ms. Levy’s prior knee pain requiring surgery in 2001, as well as a 2004 bone scan revealing “mild arthritis.” He also stated that Ms. Levy experienced “chest fluttering” as late as a week prior to the accident. Ultimately, however, in diagnosing Ms. Levy with cervical and lumbar disc disease with radiculopathy, Dr. Murphy in his expert opinion attributed the condition to the accident, which “had aggravated her pre-existing conditions and worsened them.” Dr. Rodriguez also testified that Ms. Levy’s complaints of neck and back pain became regular after the accident, whereas there were , none prior. Dr. Barcyzk further attributed the disc pathology in her neck and back to the accident. However, he did state his understanding that Ms. Levy had fully recovered from , her injuries caused by the 1988 accident. Similarly, Dr. , Voorhies 11Rattributed her . present condition to the accident, but he relied on Ms. Levy’s statement that she was “nonsymptomatic” up until the date of the accident.
' Defendants did stipulate to the authenticity of the medical records and the $44,828.99 billed[1], but reserved their right to challenge whether the bills were necessitated by the accident. Defendants did indeed make such a challenge through their own expert testimony. Dr. Charles Bain, admitted as an expert in injury causation analysis, accident reconstruction and occupant kinematics, and biomechan-ics, agreed with defense counsel that this was a minimal accident. He also disputed Ms. Levy’s account of how her body moved within the vehicle at the time of the collision, and suggested that the force was so minor as to cause no injury at all, let alone significant injury aggravating Ms. Levy’s pre-existing degenerative condition. Dr. Awasthi also testified that Ms. Levy’s MRIs taken soon after the accident revealed no acute injury. Rather, the MRIs, in his opinion, revealed “wear and tear” that occurred over time, and that everything in the MRIs appeared to be degenerative in nature. Most importantly for the defense, he testified that her issues could have been aggravated by the trauma of the accident, but that such aggravations “tend to wean off ... within about six weeks to two months.” Based on such testimony, defense counsel suggested in closing that Ms. Levy was entitled to $7,443.95, the total medical expenses for the two-month period after the accident.
*1162 There is a lack of evidence that Ms. Levy incurred any of the expenses in bad faith. Moreover, the jury’s award of $14,000 in past' medical expenses is | ^inconsistent with defense counsel’s suggestion that two months’ worth of medical expenses only amounted to $7,443:95. Therefore, this Court is unable to determine the specific expenses for which the jury intended to compensate Plaintiffs. Since Plaintiffs provided adequate proof of all expenses incurred in good faith by Ms. Levy, we find that the jury committed manifest error iri not awarding the full amount in question, and/or the district court committed legal error in not charging the jury on the law relative to iilcur-ring medical expenses in good faith.
HARMLESS ERROR ANALYSIS
This Court has explained harmless error as follows:
An error is harmless when the verdict is “surely unattributable to the error.” State v. Williams, 05-318, p. 4 (La.App. 5 Cir. 1/17/06), 921 So.2d 1033, 1036. “The test to be applied is whether the error was likely to have affected the final outcome of. the trial so that it is reversible error instead of mere harmless error.” Smith v. Travelers, Ins. Co., 418 So.2d 689, 695 (La.App. 4th Cir. 1982) (Garrison, J., dissenting), rev’d on other grounds, 430 So.2d 55 (La.1983).
Johnson v. Mike Anderson’s Seafood, Inc., 13-0379 (La.App. 4 Cir. 6/11/14), 144 So.3d 125, 132. In conducting a harmless error review, we look at the totality of the record. See Richardson v. Richardson, 07-0430 (La.App. 4 Cir. 12/28/07), 974 So.2d 761, 772. In that regard, this court has previously reasoned:
[Tjhe cumulation of trial judge errors in evidentiary rulings, coupled with other improper circumstances occurring at trial, may be so prejudicial as to deprive the parties of a fair trial, and thus may constitute reversible error, even if none of the errors considered alone would be sufficient to rise to the level of reversible error.
Fromenthal v. Delta Wells Surveyors, Inc., 98-1525, p. 3 (La.App. 4 Cir. 10/4/00), 776 So.2d 1, 4 (citing Dixon v. Winn-Dixie Louisiana, Inc., 93-1627 (La.App. 4 Cir. 5/17/94), 638 So.2d 306, 312).
In sum, we conclude that the trial court erred in denying Plaintiffs’ motion in li-mine as to evidence of passive income and granting Defendants’ motion for a Undirected verdict regarding future medical expenses. Individually, these errors might rise to nothing more than harmless error. However, when taken together, and in addition to the failure to advise the jury that Ms. Levy could be compensated for the full extent of her past medical expenses incurred in good faith, we find that these errors were not harmless and warrant reversal and remand for a new trial.
In reaching this conclusion, we find the trial erred when it denied Plaintiffs’ motion in limine as to passive income. As a result, Defendants were allowed to reference this information throughout the trial. We further find that the trial court’s manifestly erroneous decision in granting and maintaining a directed verdict regarding future medicals—despite admitting its doubts as to whether it was properly granted—also affected the outcome of the trial; Specifically, after hearing from multiple witnesses and reviewing evidence of Ms. Levy’s future prognosis, the jury wás deprived of the ability to consider such damages, despite evidence of the potential future costs reflected in Dr. Murphy’s billing-statements. Finally, the trial court’s failure to instruct the jury on the law regarding past medical amounts resulted in a verdict unsupported by the record.
For the foregoing reasons, we believe that the cumulative effect of these errors *1163 impacted the verdict to such an extent that they cannot be described as harmless. Therefore, we reverse the jury’s verdict and remand this matter for a new trial.
REVERSED AND REMANDED
BELSOME, J„ CONCURS WITH REASONS
LANDRIEU, J., DISSENTS WITH. REASONS ■
LEDET, J., DISSENTS WITH REASONS

. We note that during the course of the trial, the parties stipulated to an amount of past medical expenses totaling $41,828.99. However, in their briefs, the parties instead used an amount of past medical expenses totaling $44,828.99.