| ANDREA LOVECCHIO | * | NO. 2019-CA-0779 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| RENEE ANGELLE ROMAIN AND TODD ROSENTHAL | * | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

| CONSOLIDATED WITH: | CONSOLIDATED WITH: |
|---|---|
| ANDREA LOVECCHIO | NO. 2019-CA-0864 |
| VERSUS | |
| RENEE ANGELLE ROMAIN AND TODD ROSENTHAL | |

| CONSOLIDATED WITH: | CONSOLIDATED WITH: |
|---|---|
| ANDREA LOVECCHIO | NO. 2019-CA-0865 |
| VERSUS | |
| RENEE ANGELLE ROMAIN AND TODD ROSENTHAL | |

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2013-05432, DIVISION "A"
Honorable Ellen M Hazeur, Judge
* * * * * *
**Judge Tiffany G. Chase**
* * * * * *
(Court composed of Judge Terri F. Love, Judge Regina Bartholomew-Woods, Judge Tiffany G. Chase)

Timothy Richardson
P.O. Box 310
Madisonville, LA 70447

COUNSEL FOR PLAINTIFFS/APPELLEES

Don S. McKinney
Shelly S. Howat
Sara C. Valentine
William K. Wright, IV
ADAMS AND REESE LLP
701 Poydras Street, Suite 4500
New Orleans, LA 70139


COUNSEL FOR DEFENDANTS/APPELLANTS


Kirk P. Groh
GROH LAW FIRM, LLC
8550 United Plaza Blvd., Suite 702
Baton Rouge, LA 70809


COUNSEL FOR INTERVENOR/APPELLANT


**JUDGMENT VACATED IN PART;
REMANDED FOR NEW TRIAL
MARCH 25, 2020**

TGC
TFL
RBW

This is a medical malpractice case. Defendants Dr. Todd Rosenthal (hereinafter "Dr. Rosenthal") and Ochsner Clinic Foundation (collectively "the Ochsner Defendants"); and Intervenor-Appellant the Louisiana Patient's Compensation Fund (hereinafter "the LPCF") appeal the April 17, 2019 judgment of the trial court entering a jury verdict in favor of plaintiffs Katherine Lovecchio (hereinafter "Mrs. Lovecchio"), Joseph Lovecchio, and Donna Lovecchio (collectively "the Lovecchios"). After consideration of the record before this Court, and the applicable law, we vacate the April 17, 2019 judgment of the trial court, as to the Ochsner Defendants only, and remand the matter for a new trial.

## FACTUAL AND PROCEDURAL HISTORY

On June 29, 2012, Andrea Lovecchio (hereinafter "Mr. Lovecchio") was admitted to Ochsner Hospital after presenting to the emergency room with hypertension, shortness of breath and heart palpitations. Mr. Lovecchio, 82 years old, had a history of repeated admissions for acute decompensated heart failure, atrial fibrillation (hereinafter "a-fib"), hypertension, chronic kidney disease,

1

coronary artery disease, and previously had stents placed in his heart. On this admission, Mr. Lovecchio was diagnosed with paroxysmal a-fib.[1]

Mr. Lovecchio was treated by a cardiology team including staff cardiologist, Dr. Patrick Delaney (hereinafter "Dr. Delaney"); and first-year intern, Dr. Rosenthal. In order to maintain Mr. Lovecchio at sinus rhythm (normal heartbeat), Dr. Delaney prescribed amiodarone in oral tablet form. The amiodarone was administered at Ochsner in a loading dose of 1200 mg apportioned in three separate doses of 400 mg throughout the day. The following day, Mr. Lovecchio was discharged and the discharge instructions provided Mr. Lovecchio to take "[a]miodarone 400 mg as directed, which is t.i.d. for three days, then b.i.d. for one week and then daily afterwards of the 400 mg dose."[2] Dr. Rosenthal wrote and signed the prescription for amiodarone, which stated: "1 Tablet(s) Oral (by mouth) As directed." It further stated: "3 tablets a day for three days. 2 tablets a day for one week. 1 tablet daily thereafter."

Mrs. Lovecchio presented the prescription to Walgreens where it was filled by pharmacist Renee Romain (hereinafter "Dr. Romain"). The instructions on the medication bottle stated: "Take 3 tablets by mouth for 3 days, 2 tablets once daily for 1 week, then 1 tablet once daily thereafter." On June 30, at 10:00 p.m., Mrs. Lovecchio gave her husband three 400 mg pills of amiodarone. Waking around 2:00 a.m., Mrs. Lovecchio noticed her husband was out of bed and looking for the bathroom. Although she attempted to assist him, he eventually slumped to the

---

[1] A-fib is a condition that affects the atria, the upper chambers of the heart. The atria receive blood from the body and pump it into the ventricles, the lower chambers of the heart. The ventricles then pump blood to the rest of the body. When a-fib occurs, the atria fibrillate and blood is pumped erratically. This can result in the pooling of blood and the formation of clots. Paroxysmal a-fib is a-fib that waxes and wanes – it is not persistent.

[2] The abbreviations t.i.d. and b.i.d. are derived from Latin meaning three times a day and twice a day, respectively.

bathroom floor. Mrs. Lovecchio called for an ambulance and EMS arrived at 3:00 a.m. The EMS records reflect that Mr. Lovecchio was found sitting on the floor in the bathroom, too weak to get up. Three sets of heart rate and blood pressure readings were taken over a twenty-minute period. While Mr. Lovecchio's heart rate was in a normal range, 80 to 94, his blood pressure was elevated and recorded at the following respective diastolic/systolic readings: 216/92, 216/90, and 216/90.

EMS transported Mr. Lovecchio to Ochsner where he was admitted with weakness, shortness of breath, and hypertension. Ochsner Emergency Department records reflect that Mr. Lovecchio "was going into flash pulmonary edema," "his blood pressure was quite high," and "was in near respiratory failure." He was eventually stabilized and diagnosed with acute pulmonary edema, congestive heart failure, and a "hypertensive crisis."

On the night of July 1, 2012, while still hospitalized, Mr. Lovecchio began displaying dyskinetic symptoms (unusual movements) which were thought to be a side effect of the amiodarone. Thus, the amiodarone was withheld. On July 3, 2012, an MRI of Mr. Lovecchio's brain was performed and the results indicated that he had suffered a stroke. Mr. Lovecchio was discharged from Ochsner on July 5, 2012. Due to his declining health, Mr. Lovecchio was placed in the Chateau Living Center in September 2012. He resided there until his death on December 10, 2013.

The Lovecchios filed suit, alleging negligence on the part of the Ochsner Defendants as Dr. Rosenthal's prescription failed to specify that the amiodarone should have been taken in three separate doses throughout the day.[3]  The

_____

[3] The lawsuit was filed prior to Mr. Lovecchio's death. His children were substituted in his capacity as plaintiffs after his death.

Lovecchios also sought damages from Walgreens and Dr. Romain (collectively "the Walgreens Defendants") for negligently filling the prescription and indicating on the medication bottle that the amiodarone should be taken "once daily."

The Ochsner Defendants filed an exception of prematurity and were dismissed from the lawsuit. Plaintiffs filed a petition to institute a medical review panel and a panel was convened. The panel rendered its opinion finding that the 1200 mg dose of amiodarone, given at one time or divided in doses, did not cause Mr. Lovecchio's stroke. The panel also found that the stroke was not caused by hypoperfusion (ischemia or shock resulting from low blood pressure). The Lovecchios subsequently amended the lawsuit to re-urge their claims against the Ochsner Defendants.

A jury trial was held March 25, 2019 through March 30, 2019. In addition to testimony from the Lovecchios and Dr. Romain, numerous experts testified as to the requisite standard of care, causation, and the effects of amiodarone on the body. Four experts testified on behalf of the Lovecchios: cardiothoracic surgeon, Dr. Carl Adams (hereinafter "Dr. Adams"); expert in pharmacy, Dr. Charles Jastram (hereinafter "Dr. Jastram"); expert in pharmacy, Dr. Diane Ginsburg (hereinafter "Dr. Ginsburg"); and neurologist Dr. Chad Domangue (hereinafter "Dr. Domangue"). Four experts testified on behalf of the Ochsner Defendants and Walgreens Defendants: neuroradiologist Dr. Robert Dawson (hereinafter "Dr. Dawson); cardiologist Dr. Delaney; cardiologist Dr. Frederick Kushner (hereinafter "Dr. Kushner"); and retail pharmacist Mr. Kerry Milano (hereinafter "Mr. Milano"). Documentary evidence was also introduced, including the FDA package insert for amiodarone which discussed various precautions and warnings regarding the drug.

The trial court excluded Dr. Rosenthal from testifying as an expert in cardiology, limiting him as a fact witness. The trial court also ruled that Dr. Kurt Varner (hereinafter "Dr. Varner") would not be qualified as an expert in pharmacology and excluded his testimony in its entirety. The Ochsner Defendants and Walgreens Defendants objected[4] and the expert testimony of Dr. Rosenthal and Dr. Varner was proffered and made a part of the record on appeal.

During the jury charge conference, the Lovecchios submitted a proposed jury charge using language from *DaRoca v. St. Bernard General Hosp.*, 347 So.2d 933, 934 (La.App. 4th Cir. 1977). The proposed jury charge stated: "A physician has a duty not to prescribe a higher dosage of a dangerous drug than is reasonably necessary to control the patient's condition under the circumstances" (hereinafter "the *DaRoca* charge"). The Ochsner Defendants argued the *DaRoca* case predated the enactment of La. R.S. 9:2794 wherein the legislature articulated the appropriate burden of proof for a medical malpractice case. The trial court allowed the proposed charge into the final instructions given to the jury.

After deliberation, the jury rendered a verdict in favor of the Lovecchios and assigned 75% fault to the Ochsner Defendants and 25% fault to the Walgreens Defendants.[5] On the interrogatory form, the jury checked "yes" finding that the "breach in the Standard of Care by Dr. Rosenthal/Ochsner was a cause in fact of

---

[4] An emergency writ was taken to this Court to review the trial court's exclusion of Dr. Varner; however, the writ was not considered for failure to comply with Rules 4-2 and 4-5, Uniform Rules, Courts of Appeal. *See Lovecchio, et al. v. Romain, et al.*, 2019-0293 (La.App. 4 Cir. 3/29/19) (unpub).

[5] During their deliberation, the jury submitted a question pertaining to the interrogatories. The trial court conducted a conference on the record with counsel for both parties. As stated by the trial court, the question was, with respect to interrogatories three and five, "does the word injuries refer specifically to the stroke or general injuries." After hearing argument from both parties, the trial court determined the answer would be "[a]ny injuries you find are proximately caused by any negligent conduct of the Defendants." The answer was reduced to writing and submitted to the jury.

5

injuries to Andrea Lovecchio." Submitted with the interrogatory form, and entered into the record, was a handwritten note from the jury. The note was read into the record and stated: "[W]e, the jury, have concluded that the incorrect dose of amiodorone [sic] more likely than not did not cause Mr. Lovecchio's stroke, however it more likely than not it [sic] did cause harm." The jury awarded $0 for Mr. Lovecchio's pain and suffering; $149,474.08 for his medical expenses; $800,000 to Mrs. Lovecchio for loss of consortium, $50,000 to Joey Lovecchio for loss of consortium; and $10,000 to Donna Lovecchio for loss of consortium.

Prior to the trial court reducing the verdict of the jury to a written judgment, the Ochsner Defendants moved for a mistrial arguing that the jury rendered an inconsistent verdict. Notwithstanding this motion, the verdict was reduced to a written judgment on April 17, 2019.[6]

The Ochsner Defendants filed a motion for judgment notwithstanding the verdict or, alternatively, new trial on two primary grounds. First, that the exclusion of Dr. Varner and Dr. Rosenthal's expert testimony was prejudicial to their ability to present a defense. Second, the jury was not presented with any evidence which would warrant a finding of harm independent from the stroke. The trial court denied the motions, reaffirmed its prior evidentiary rulings, and concluded that the Lovecchios elicited sufficient testimony from the experts as to the toxicity and potential side-effects of amiodarone noted on the FDA package insert.

The Lovecchios filed a motion and order for partial dismissal with prejudice representing they had reached a settlement with the Walgreens Defendants. The

---

[6] The trial court would later deny the motion for mistrial in the same judgment it denied the Ochsner Defendants' motions for judgment notwithstanding the verdict or, alternatively, new trial.

order was signed by the trial court on June 26, 2019 and all claims against the Walgreens Defendants were dismissed with prejudice.[7] The Ochsner Defendants and the LPCF, as a statutory intervenor, appealed.

## STANDARD OF REVIEW

Although an appellate court generally reviews a jury's finding of fact under a manifest error standard of review, "'when a trial court erroneously instructs the jury in law, or makes a consequential error in the exclusion of evidence, the trial court judgment which implements the jury verdict should not be accorded any weight.'" *Fromenthal v. Delta Wells Surveyors, Inc.*, 1998-1525, pp. 3-4 (La.App. 4 Cir. 10/4/00), 776 So.2d 1, 4 (quoting *Jaffarzad v. Jones Truck Lines, Inc.*, 561 So.2d 144, 152 (La.App. 3rd Cir. 1990)). Thus, "[a] legal error occurs when a trial court applies incorrect legal principles and those errors are prejudicial such that they materially affect the outcome and deprive a party of substantial rights." *Robert v. Robert Management, Co., LLC*, 2014-0822, p. 15 (La.App. 4 Cir. 2/11/15), 164 So.3d 922, 933. "When reviewing legal errors, an appellate court is required to review the record *de novo*." *Id*.

## DISCUSSION

The trial court committed consequential evidentiary and legal errors which interdicted the fact finding process. Cumulatively, "errors in evidentiary rulings, coupled with other improper circumstances occurring at trial, may be so prejudicial as to deprive the parties of a fair trial, and thus may constitute reversible error, even if none of the errors considered alone would be sufficient to rise to the level

---

[7] The Lovecchios later filed a satisfaction of judgment representing they received funds from the Walgreens Defendants in full payment pursuant to the terms of the April 17, 2019 judgment. The order was signed by the trial court on July 23, 2019.

7

of reversible error." *Fromenthal*, 1998-1525, p. 3, 776 So.2d at 4. The Ochsner Defendants contend the trial court erred by excluding the expert testimony of Dr. Rosenthal and Dr. Varner and by instructing the jury to use an inapplicable burden of proof. We address each contention in turn.

## EXCLUSION OF EXPERT TESTIMONY

A trial court's determination on "whether expert testimony should be admitted and who should or should not be qualified as an expert," shall not be disturbed absent an abuse of discretion. *Boudreaux v. Bollinger Shipyard*, 2015-1345, p. 15 (La.App. 4 Cir. 6/22/16), 197 So.3d 761, 770-71. However, "a court necessarily abuses its discretion if its ruling is based on an erroneous view of the law." *Id.*, p. 16, 197 So.3d at 771.

The trial court excluded Dr. Rosenthal from testifying as an expert, limiting him as a fact witness. At trial, the Lovecchios argued that since Dr. Rosenthal was only a first-year intern at the time of the alleged negligence, it would be confusing to the jury to have a now experienced Dr. Rosenthal validate his past actions under the guise of his own expert testimony. The Ochsner Defendants counter that La. R.S. 9:2794(D)(3) and (5) provide that an individual may be qualified as an expert either "at the time the claim arose or at the time the testimony is given," and that a physician shall not be prohibited "from qualifying as an expert solely because he is a defendant in a medical malpractice claim." The trial court relied on La. C.E. art. 403 and found that Dr. Rosenthal's expert testimony was cumulative of testimony already presented by Dr. Delaney and Dr. Kushner; the Ochsner and Walgreens Defendants would not be prejudiced by the omission of Dr. Rosenthal's expert testimony; and the probative value would be outweighed by potential confusion to the jury. Thus, the issue for our consideration is not whether Dr. Rosenthal should

be qualified as an expert, rather, it is whether the trial court was within its great discretion in balancing the potential confusion to the jury against the probative value of Dr. Rosenthal's expert testimony.

Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of "confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La. C.E. art. 403. Although La. C.E. art. 403 omits the "cumulative" language of its federal counterpart, the interpretive result is the same. Considerations of "undue delay" and "waste of time" permit a judge to exclude additional testimony as cumulative. *See Entergy Gulf States, Inc. v. Louisiana Public Service Com'n*, 1998-1235, p. 51 (La. 4/16/99), 730 So.2d 890, 927-28 (quoting Frank L. Maraist, LOUISIANA CIVIL LAW TREATISE EVIDENCE & PROOF § 5.1, at 68 (1999)). Dr. Rosenthal's proffered expert testimony is brief and the expert opinions offered by him therein are cumulative of opinions given by Dr. Dawson, Dr. Delaney, and Dr. Kushner. Accordingly, as Dr. Rosenthal's expert testimony has relatively low probative value due to its cumulative nature, we find the trial court did not abuse its discretion in excluding the testimony because of the danger of potential confusion to the jury.

The trial court also declined to qualify Dr. Varner as an expert in pharmacology concluding he did not demonstrate "the requisite knowledge, experience, and training with the drug amiodarone." Louisiana Code of Evidence Article 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the relevant statutory criteria are met. However, we find the Code of Evidence is not so restrictive as to require that a pharmacologist be an expert

9

specialized to a specific drug. *See*, e.g. La. R.S. 9:2794(D)(3) (pertaining to physician witnesses and not pharmacologists, the medical malpractice statute only requires "substantial training or experience in an area of medical practice relevant to the claim…"). A "court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable" as "expert testimony is subject to being tested by 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Tadlock v. Taylor*, 2002-0712, p. 4 (La.App. 4 Cir. 9/24/03), 857 So.2d 20, 26 (quoting *Keener v. Mid-Continent Casualty*, 2001-1357, p. 12 (La.App. 5 Cir. 4/30/02), 817 So.2d 347, 354-55). Any deficiencies in an expert in pharmacology's knowledge, experience, or training with respect to a particular drug goes towards the weight of their opinion and does not merit the outright exclusion of its consideration by the finder of fact. *See Gaffney v. Giles*, 2014-0384, pp. 10-11 (La.App. 4 Cir. 4/29/15), 165 So.3d 1100, 1107.

Dr. Varner's qualifications were presented to the trial court during his expert *voir dire*. Dr. Varner has a Ph.D. in toxicology and pharmacology from Michigan State University. He underwent three years of postgraduate training in cardiovascular pharmacology and physiology at the University of Iowa. Since 2006, Dr. Varner has been the head of the Department of Pharmacology and Experimental Therapeutics at LSU Health Sciences Center in New Orleans. He has been a professor at LSU for thirty years. Dr. Varner is currently an Associate Editor of the scholarly journal *Cardiovascular Toxicology* and has co-authored approximately sixty peer-reviewed journal articles on various subjects in his field of expertise. Given Dr. Varner's aforementioned qualifications, the trial court abused its discretion in its restrictive interpretation of the Code of Evidence. The

trial court's interpretation improperly conditioned Dr. Varner's qualification upon specialization to the specific drug, amiodarone. Thus, we find the trial court erred in Dr. Varner's exclusion.

## IMPROPER JURY CHARGE

The Ochsner Defendants additionally contend that the trial court erred by incorporating the *DaRoca* charge into the jury instructions as the case predates the enactment of La. R.S. 9:2794.[8] It is the Ochsner Defendants' contention that *DaRoca* has been legislatively overruled. We agree. The charge, on its face, undermines the statutorily established standard and replaces it with a general negligence standard that is no longer applicable. It also employs conclusory language which implies that amiodarone is, inherently, a "dangerous drug." The Ochsner Defendants' contention was even bolstered by the testimony of the Lovecchios' own expert, Dr. Adams, who stated amiodarone was "[v]ery safe," if prescribed correctly. Given this testimony, coupled with the abrogation of *DaRoca* by the enactment of La. R.S. 9:2794, we find the trial court erred by including the *DaRoca* charge in the jury instructions.

## CUMULATIVE PREJUDICE

Finding the trial court erred in excluding the expert testimony of Dr. Varner and including the *DaRoca* charge in the jury instructions; we must now evaluate whether these errors, cumulatively, are prejudicial to the extent they constitute reversible error. "The test to be applied is whether the error was likely to have

---

[8] "Under La. R.S. 9:2794, a plaintiff in a medical malpractice case is required to prove, by a preponderance of the evidence, the following three elements: (i) the standard of care applicable to the defendant; (ii) the defendant's breach of the standard of care; and (iii) the existence of a causal connection between the breach and the resulting injury." *Jordan v. Community Care Hosp.*, 2019-0039, p. 11 (La.App. 4 Cir. 7/24/19), 276 So.3d 564, 575 (citing *Samaha v. Rau*, 2007-1726, p.5 (La. 2/26/08), 977 So.2d 880, 883-84). We also note that *DeRoca* has not been cited to in the nearly forty years since its rendition.

11

affected the final outcome of the trial so that it is reversible error instead of mere harmless error." *Levy v. Lewis*, 2016-0551, p. 19 (La.App. 4 Cir. 5/17/17), 219 So.3d 1150, 1162 (citation omitted). "An error is harmless when the verdict is surely unattributable to the error." *Id* (citation omitted). "In conducting a harmless error review, we look at the totality of the record." *Id*. Our inquiry necessarily focuses on the circumstances of the particularized verdict as rendered by the jury that found the amiodarone caused harm independent of the stroke.[9]

Dr. Varner was offered as an expert in pharmacology and would have been the only pharmacologist to testify at trial. In his proffer, Dr. Varner explained:

> Pharmacology is the study of how drugs and foreign chemicals interact with the body. How they're absorbed, how they are distributed, how they are metabolized, their mechanism of action, their side effects.

Although Dr. Varner's proffered testimony was cumulative,[10] he was the only expert to offer detailed testimony on the effects of amiodarone on the body. Relying on guidelines issued by the American College of Cardiology and the American Heart Association, Dr. Varner stated that a one-time dose of 30 mg per kg of body weight was an acceptable daily loading dose – this would range from 1350 mg to 1400 mg for Mr. Lovecchio. The 1200 mg dose given to Mr. Lovecchio would be on the lower end of the recommended range. Dr. Varner also opined that toxicity was a chronic side effect which would only manifest in patients who were past the loading dose phase and into the maintenance phase. He

---

[9] The Lovecchios did not file an answer to the appeal or otherwise challenge the jury's finding that the amiodarone did not cause the stroke.

[10] Dr. Delaney and Dr. Kushner briefly discussed the need for loading doses of amiodarone given how the drug was absorbed in the tissues of the body.

was unaware of acute toxicity being associated with the oral tablet form of the drug.

Dr. Varner further opined on the Lethal Dose 50% (hereinafter "the LD50") for amiodarone. The LD50 is the amount of a substance (based on body weight) that would kill fifty percent of the test population who ingested it. In a study of rats, the reported LD50 of amiodarone was 3,000 mg per kilogram of body weight of the subject. Given this proffered testimony, particularly in light of the jury's specific finding that the amiodarone caused harm independent of the stroke, we find the trial court's decision not to qualify Dr. Varner excluded important and relevant expert testimony from the jury's consideration.

In reviewing improper jury charges, this Court in *Seal v. State Farm Fire & Cas. Co.*, 2000-2375, pp. 4-5 (La.App. 4 Cir. 3/20/02), 816 So.2d 868, 871-72, stated:

> The mere discovery of an error in the instruction does not of itself justify the reviewing court conducting the equivalent of a trial *de novo*, without first measuring the "gravity or degree of error and considering the instruction as a whole and the circumstances of the case." *Brown v. White*, 405 So.2d 555, 558 (La.App. 4th Cir.1981). The reason for this standard of review is because a losing party can usually find some deficiencies in the instructions to argue for a reversal. The question to be determined is whether the jury was misled to the extent that it was prevented from dispensing justice. *Id*. at 560. In considering an argument of improper jury instruction, the court should consider the entirety of the charges and determine if they adequately provide the correct principles of law applicable to the issues as framed by the pleadings and the evidence, and whether they provide adequate guidelines for the jury. *Clark v. Jesuit High School of New Orleans*, [19]96–1307, p. 7 (La.App. 4 Cir. 12/27/96), 686 So.2d 998, 1002-03. *De novo* review is only justified when the jury charges "are so incorrect or so inadequate that the jury was precluded from reaching a verdict based on the law and the facts." *Id*., at 273-74. Where small portions of the instructions are isolated from the context and are erroneous, error is not necessarily prejudicial. *Brown*, 405 So.2d at 558.

Under this standard, we find the improper jury charge contributed to the cumulative prejudice against the Ochsner Defendants.

The jury's verdict specifically found that "the incorrect dose of amiodorone [sic] more likely than not did not cause Mr. Lovecchio's stroke, however it more likely than not it [sic] did cause harm." The Lovecchios argue the jury premised its finding of harm independent of the stroke based on the experts' discussion of the adverse effects of amiodarone in the FDA package insert. Under this theory, referring to amiodarone as a "dangerous drug" and inserting an improper general negligence standard in the jury instructions likely misled the jury in reaching this particularized finding.

The prejudice to the Ochsner Defendants is evident from the totality of the record. Compounding this prejudice is the inconsistent nature of the jury's verdict in its award of $0 to Mr. Lovecchio in pain and suffering damages in contrast to the award of $860,000 for the derivative claims of his family members.[11] *See* La. C.C.P. art. 1813(E); *Banks v. Children's Hosp.*, 2013-1481, pp. 8-10 (La.App. 4 Cir. 12/17/14), 156 So.3d 1264, 1269-72 (legal error that triggered *de novo* review where jury awarded damages for grief and mental anguish despite finding no breach of the standard of care by defendant hospital); *Caldwell v. Let The Good Times Roll Festival*, 30,800, pp. 7-8 (La.App. 2 Cir. 8/25/98), 717 So.2d 1263, 1267-68 (legal error that triggered *de novo* review where jury found liability as to all plaintiffs but awarded no damages to a particular class of plaintiffs). We therefore find the evidentiary and legal errors committed by the trial court

---

[11] This inconsistency is similar to *Banks* wherein the jury's foreperson noted to the trial court "that the monetary amounts the jury listed were intentional because the jury believed that the negligence of the defendant had not caused [decedent's] death but had caused 'emotional distress' to her parents." *Banks*, 2013-1481, p. 9, 156 So.3d at 1269.

14

cumulatively operated to deprive the Ochsner Defendants of a fair trial. Accordingly, we order the April 17, 2019 judgment of the trial court vacated as to the Ochsner Defendants only.

## REMAND FOR NEW TRIAL

In cases where the weight of the evidence is nearly equal and an appellate court is unable to fairly find a preponderance of evidence from a cold record, remand for a new trial is appropriate. *See McGregor v. Hospice Care of La. in Baton Rouge, LLC*, 2014-2591, p. 1 (La. 4/24/15), 177 So.3d 322 (per curiam) (quoting *Ragas v. Argonaut Southwest Ins. Co.*, 388 So.2d 707, 708 (La. 1980)); *Cerniglia v. French*, 2000-2768, pp. 9-14 (La.App. 4 Cir. 4/3/02), 816 So.2d 319, 325-28; *Chatman v. Southern University at New Orleans*, 2015-1179, p. 20 (La.App. 4 Cir. 7/6/16), 197 So.3d 366, 396 n.23 (Ledet, J., dissenting). "Whether a particular case should be remanded is a matter which is vested largely within the court's discretion and depends upon the circumstances of the case." *Wegener v. Lafayette Ins. Co.*, 2010-0810, p. 20 (La. 3/15/11), 60 So.3d 1220, 1234.

After a close review of the record, we find "the weight of the evidence is so nearly equal that a firsthand view of witnesses is essential to a fair resolution of the issues." *Ragas*, 388 So.2d at 708. In so finding, we observe that the rule articulated by our Supreme Court in *Ragas* is particularly applicable to medical malpractice cases "because the jury must have the opportunity to make credibility determinations after a full examination of the experts' credentials, qualifications, and background." *Hoffman v. Paracelsus Elmwood Medical Center, Inc.*, 2003-0659, pp. 17-18 (La.App. 4 Cir. 9/1/04), 881 So.2d 796, 807 (citing *Adeola v. Kemmerly*, 2001-1231 (La.App. 1 Cir. 6/21/02), 822 So.2d 722). In the matter *sub judice*, a considerable amount of cross-examination was conducted challenging

15

both the qualifications and potential bias of the testifying experts. It is difficult to perceive from a cold record the demeanor of the testifying experts when confronted with these challenges. *See Oddo v. Asbestos Corp. Ltd.*, 2014-0004, p. 17 (La.App. 4 Cir. 8/20/15), 173 So.3d 1192, 1205 n.11.

The experts offered contradicting opinions as to whether Mr. Lovecchio's stroke was caused by hypertension from his underlying a-fib or hypotension resulting from the administering of 1200 mg of amiodarone in a single dose. Similarly, the experts disagreed as to whether administering amiodarone in a single daily loading dose of 1200 mg was medically appropriate or constituted a potentially harmful overdose. The experts also disagreed as to the applicability of the warnings on the FDA package insert for amiodarone, particularly its relevancy to a-fib versus ventricular fibrillation or ventricular arrhythmias.

Given the conflicting expert testimony on the relevant issues before us, we conclude that a resolution of these issues depends heavily on credibility determinations made after a first-hand view of the expert witnesses. *See Hoffman*, 2003-0659, pp. 18-19, 881 So.2d at 808.

## DECREE

For the foregoing reasons, we vacate the April 17, 2019 judgment as to the Ochsner Defendants only. The matter is remanded to the trial court to conduct a new trial in accordance with this opinion. The Walgreens Defendants are to be treated as non-party defendants and, pursuant to La. C.C. art. 2323(A), are to appear on the verdict form and may be allocated a percentage of fault by the jury. No reference is to be made of the prior trial or the amount paid by the Walgreens Defendants in satisfaction of their share of the April 17, 2019 judgment.

16

**JUDGMENT VACATED IN PART;
REMANDED FOR NEW TRIAL**