Judge Dale N. Atkins
Bryan Lichtenstein ("Lichtenstein") and his insurer, United Services Automobile Association (collectively "Appellants"), appeal the jury's verdict returned on February 16, 2017, which found Lichtenstein liable as the sole cause of a motor vehicle accident which occurred between Lichtenstein and Appellee, Alvin McBride ("McBride"). McBride and his granddaughter, Dynte Moore ("Moore" or collectively "Appellees") were injured in the accident. The jury awarded damages to McBride in the amount of $279,000 for pain and suffering, $32,956.36 for past medical expenses and $279,000 for loss of enjoyment of life and, awarded Moore $32,000 for pain and suffering, $50,000 for loss of enjoyment of life, $50,000 for permanent disfigurement and $15,317.00 for past and future medical expenses. Appellants also appeal the trial court's May 17, 2017 judgment denying Appellants' Motion for Judgment Notwithstanding the Verdict ("JNOV") or, alternatively, for New Trial. Appellants do not contest the issue of liability on appeal, but do contest the jury's award of damages to both Appellants. McBride filed a cross-appeal, asserting that the trial court erred in failing to allow the admission of evidence in support of his claim for future medical expenses and in granting a directed verdict on the issue of future medical expenses, thus preventing the issue from being presented to the jury. For the following reasons, we amend the damage award to include an award of $10,000 in future medical expenses for McBride and otherwise affirm the jury's verdict and award of damages.
Testimony at Trial
On December 3, 2012, at approximately 7:20 p.m., Lichtenstein was driving his Hyundai Genesis automobile through the intersection at Elysian Fields Avenue and North Claiborne Avenue in New Orleans. Lichtenstein's vehicle collided with a Mazda Protégé vehicle, driven by McBride, 80 years of age; McBride's two granddaughters, 18 year old Dynte Moore, a younger granddaughter, Kayla, and Kayla's friend were passengers in the Mazda.
Officer Terrell Seiber ("Off. Seiber") was the investigating officer who arrived on the scene of the accident. He testified that Lichtenstein's vehicle had been traveling northbound on Elysian Fields Avenue in the middle lane approaching the intersection *663 at North Claiborne Avenue and McBride's vehicle was traveling eastbound on North Claiborne Avenue in the right lane. Lichtenstein admitted to Off. Seiber that he had assumed he had a green light as he entered the intersection. Realizing that he, in fact, had a red light, he applied the brakes but nonetheless hit McBride's vehicle. According to Off. Seiber, McBride reported that he entered the intersection with a green light. Off. Seiber found that the traffic lights were functioning properly and did not notice anything that would obscure a driver's ability to see the traffic lights. McBride and Moore, who sustained a laceration to her forehead, were transported to the hospital for assessment of their injuries.
Lichtenstein testified he was not familiar with the intersection and was getting directions from one of his passengers at the time of the accident. He stated that he did not see the traffic light because another vehicle was blocking his view. Lichtenstein estimated he was traveling at a rate of 35 miles per hour.
McBride and Moore were treated at the emergency room ("ER") of Ochsner Medical Center. Dr. Ruth Foster ("Dr. Foster") was the emergency room physician who evaluated McBride. She testified that she found no significant trauma during her exam but explained that did not negate pain and injury. McBride had indicated that his pain level was a 7 out of a scale of 10 initially and Dr. Foster found his blood pressure was elevated. McBride complained at admission of left side pain, which she thought indicated possible kidney tenderness, which is normal after an accident when the driver is wearing a seat belt. McBride did not complain at that time about lower back pain. Dr. Foster ordered an EKG, chest x-rays and a CT scan of McBride's head and neck. The CT scan of the cervical spine revealed no acute fractures but did reveal moderate and varying degrees of spinal canal stenosis and a slight narrowing of the neural foramina which she attributed to a chronic condition rather than to the accident. An MRI was not ordered, although Dr. Foster indicated an MRI would be preferable to determine if a soft-tissue or disc injury was present. She also did not order an x-ray or CT of the lumbar area. Instead, she treated McBride for pain and sent him home with anti-inflammatory and pain medication. At discharge, he reported his pain to be a 3 on a scale of 10. Dr. Foster confirmed that if McBride already had a degenerative joint disease before the accident, he would be more vulnerable to injury as a result of the trauma he sustained. She also stressed that a victim of a car accident, particularly one McBride's age, could feel very different in the days or weeks after an initial emergency room evaluation. For this reason, she referred him to seek follow-up care with his primary care physician.
Admitted medical records indicate that Moore was treated in the same ER but by Dr. Michael Freeto ("Dr. Freeto"). She complained of a headache and had a laceration on her forehead. The laceration, located on her left anterior forehead, was repaired after a subcutaneous injection of lidocaine was administered.[1] A CT scan of the cervical spine and another CT of the head revealed no acute abnormality. Moore was discharged with pain medication.
Dr. Brian Ogden ("Dr. Ogden"), a radiologist at Ochsner Medical Center, testified that he reviewed the CT scans and *664 chest x-ray of McBride and the CT scans of Moore. He similarly reported finding nothing acute to indicate recent trauma to either of them. With regard to McBride, he compared a CT scan performed by the Veterans Administration's Health Service ("V.A.") on March 23, 2012, with the CT scan performed on the night of the accident. He stated that both showed a mild retrolisthesis of the cervical spine at C4-C5, indicating a curvature that was pre-existing. The CT scans of Moore's head and cervical spine were normal. Similar to Dr. Foster's testimony, Dr. Ogden confirmed that CT images were limited in the ability to view soft tissue, discs, and ligaments. He also stated that a CT image done on the day of the accident would not predict what could happen to the spine as a result of the accident a year or two later. He opined that the "better imaging modalities for soft tissues and ligaments in the disc [and] in the spine would be the MRI." Additionally, Dr. Ogden indicated that sustaining a soft tissue injury could cause a pre-existing degenerative condition to accelerate.
Medical records entered into evidence established that follow-up care was obtained by both McBride and Moore from Dr. DeAbate at New Orleans Health Care Center beginning in December 2012. Moore was initially treated for acute cephalgia (headache pain), acute thoracic and lumbar strain, acute anterior chest wall strain and acute cephalgia laceration and contusion. She received modality treatments consisting of moist heat, electromuscular stimulation, and ultrasound to the thoracic and lumbar area and was advised to continue on hydrocodone pain medication. Dr. DeAbate noted that Moore's medical problems were causally related to the motor vehicle accident of December 3, 2012, "with a reasonable degree of medical certainty." Moore continued to periodically receive modality treatments from Dr. DeAbate until she requested discharge in June 2013.
McBride also was treated by Dr. DeAbate and complained of upper and lower back pain, right posterior leg pain, as well as neck pain. Dr. DeAbate's notes indicate that McBride revealed he had a previous accident in which he had sustained an injury to his lumbar region ; McBride reported that it was treated and resolved. McBride was diagnosed with acute cervical strain, acute trapezius muscle strain, acute lumbar strain and acute right lower extremity strain. Dr. DeAbate noted that McBride's symptoms were "causally related to the motor vehicle accident of December 3, 2012, with a reasonable degree of medical certainty." After several follow-up visits with similar continuing complaints, an MRI was taken of McBride's cervical spine in May 2013, which indicated the following: probable muscle spasm; cervicothoracic scoliosis (curvature); prominent disc dehydration; moderate disc narrowing with a small right paracentral disc herniation at the C3-4; evidence of cervical spondylosis on the right C4-5; prominent disc narrowing with mild diffuse disc bulging at the C4-5 and C6-7; moderate disc narrowing at the C5-C6; and, evidence of mild diffuse disc bulging at T1-2 and T2-3. An MRI was also taken of the lumbar spine which showed prominent levoscoliosis (spine curvature ); prominent dehydration of all included discs; moderate narrowing with mild diffuse disc bulging at T12-L1 and L1-2; prominent disc narrowing with mild diffuse disc bulging at L2-3 and L4-5; moderate chronic right lateral compression of L3 vertebral body; prominent disc narrowing with mild diffuse disc bulging at the L3-4; lumbar stenosis at L3-4, L4-5 and L5-S1; Grade I spondylosis (spine degeneration) of L4 on L5; evidence of lumbar spondylosis on the left L4-5; bilateral facet joint arthritis at L4-5 with left facet joint *665 arthritis at L5-S1; and, a small subligamentous right paracentral disc herniation at L5-S. McBride requested to be discharged from Dr. DeAbate's care and was given a referral for a neurosurgeon for further evaluation in May 2013. He instead sought help from Dr. Hamsa, as did Moore.
Dr. Rudolph Hamsa ("Dr. Hamsa"), McBride and Moore's primary treating physician and an expert in orthopedics with 45 years of experience, testified on Appellees' behalf. McBride's first visit to Dr. Hamsa was on July 11, 2013, during which McBride reported that he had been injured in a December 3, 2012 auto accident. Dr. Hamsa explained at trial that he had reviewed McBride's prior treatment records from the V.A. which, as of November 9, 2012 (the date closest in time to the accident), noted prior intermittent back pain related to arthritis inflammation in the back joints. McBride told Dr. Hamsa that his pre-existing condition had not bothered him in 2-3 months. Prior visits to the V.A. showed middle back area arthritis in joints with stenosis and Grade I "slippage" noted between L4-5 vertebrae and spondylolisthesis. Dr. Hamsa noted that people with the medical issues which McBride had prior to the accident can live normal lives, and just feel discomfort occasionally.
Dr. Hamsa also acknowledged that he was not the first treating physician. He was aware that Dr. DeAbate had treated McBride for several months and had recommended that McBride see a neurosurgeon. Dr. Hamsa acknowledged Dr. DeAbate's recommendation, but stated that McBride chose to see him because he believes in conservative care before "endangering a patient" unnecessarily.
Dr. Hamsa's own diagnosis of McBride at the first visit was as follows: cervical contusion (head)-stable; cervical spondylosis, arthritis in neck ; cervical sprain with disk herniation at C3-4, bulges C4-5 and C6-7; lumbar arthrosis ; arthritis to facet joints; lumbar sprain with herniated L5-S1 and traumatic bulges at L2-3 and L4-5; slight compression of L3 vertebral body; post-traumatic temporomandibular joint pain ("TMJ"); trigger point tenderness at C7; and back spasm. He concluded that McBride suffered from an aggravation/deterioration of a pre-existing condition. McBride's stooped walking was specifically attributed to degenerative joint and disc disease. Dr. Hamsa reviewed McBride's most recent MRI for the jury, performed January 30, 2017, and concluded that the spine had deteriorated since the accident. He testified there was increased disc protrusion, with "spinal fluid coming down" and being "pinched off, and now two levels rather than one of listhesis." He recommended, consistent with the recommendation of the independent medical examiner ("IME"), Dr. Everett Robert, Jr. ("Dr. Robert"), that McBride may be helped by surgical decompression above the L2-3, L3-4 and L4-5 levels. He noted, however, that McBride could lose bladder and bowel control if the S1 and S2 nerve roots were to become pinched.
With regard to Moore, Dr. Hamsa initially diagnosed cervical discogenic sprain (C3 and C4-5); cranial contusion and laceration, stable; lumbar sprain with moderate ligament stretch at L4-5 and L5-S1 with listhesis and traumatic bulging. His report noted that the x-rays from the date of Moore's injury showed normal cranial and cervical views and that cervical spine injury was omitted in the listed impression from the emergency room. He stated that the ER may have been focused on Moore's head injury rather than her back. He further noted that an MRI done on May 9, 2013 showed splinting and rotation (spasm) with retrolisthesis of the L4 on L5 and L5 *666 on S1 and traumatic bulges at both levels. He prescribed an anti-inflammatory medication for Moore. During follow-up visits, Moore complained of recurring headaches and neck and lumbar problems for which she was given anti-inflammatory medication.
Dr. Robert, a neurosurgeon, also provided testimony, via video deposition. At Appellants' request, Dr. Robert evaluated McBride in October 2016. He reported that McBride's primary complaint was about lower back pain exacerbated by both sitting and standing. McBride also reported pain in his left lower extremity/leg extending to his buttock and down the back part of his knee. Dr. Robert noted that McBride denied experiencing any significant problems with his neck, arm, leg, and back prior to the accident. He stated that McBride did not volunteer any information about his prior treatment for lower back pain. However, he admitted he did not specifically ask McBride whether he had prior accidents, or whether he had received an earlier MRI or imaging. Dr. Robert reviewed the medical records of Dr. DeAbate and stated that by March 2013, it was reported that McBride had a full range of motion in his neck and no spasm; no adverse change was noted during subsequent examinations. Additionally, by May 2013, Dr. DeAbate noted that examination of McBride's lumbar spine revealed flexion at 95 degrees and extension limited to 30 degrees with no pain reported. Dr. Robert's own physical examination of McBride revealed no abnormalities in sensation, motor strength, reflexes, neurological function and no tenderness upon palpation. He noted a decreased range of motion in McBride's lumbar spine, and based upon MRI images taken on May 9, 2013, he stated that McBride had grade 1 spondylolisthesis (at L4-5 and L5-S1) with spinal stenosis, which, in his opinion, was a degenerative misalignment. Dr. Robert also reviewed a report, though not the actual images, from an earlier MRI done at the V.A. in March 2011, and he reported findings similar to those based on the MRI performed post-accident in May 2013. He also compared a report from an MRI performed on January 30, 2017 with the images done in May 2013 and found no significant changes.
Dr. Robert was puzzled by Dr. Hamsa's report that there were two traumatic disc bulges in the neck, one at C3-4 and one in the low back at L5-S1; the only way a film could indicate trauma to the disc, he opined, was to show edema (swelling) and/or hemorrhage -which would usually show up at approximately 6-8 weeks post-accident. The images that Dr. Robert reviewed were of an MRI done on May 9, 2013, and it did not reveal any edema, swelling or hemorrhage. He opined that the impairment visible on the MRI is not something that happens in an "abrupt punctuated fashion," but rather through a graduation of symptoms over time, consistent with a longstanding problem. Dr. Robert's final diagnosis of McBride's condition was as follows: degenerative spondylolisthesis at the L4-5 level, causing spinal stenosis and neurogenic claudication (impingement or inflammation of the nerves of the spinal chord). He stated that he was of the opinion that McBride had low back problems before the accident. He found it "unlikely" though not "impossible" that McBride was asymptomatic before the accident. He stated that McBride's medical records, which he viewed after making his own diagnosis, corroborated his opinion.
On cross-examination, Dr. Robert stated that McBride could benefit from a spinal decompression and a lumbar fusion surgery. He reported that McBride was very cooperative with him during the examination and did not seem as if he was exaggerating his symptoms or giving less than *667 a full effort. He could not say exactly how long his examination of McBride took but indicated that his typical examination of patients takes about 30 minutes though he usually allocates 45 minutes of time per patient. Dr. Robert also conceded that an individual in a car accident with a pre-existing injury such as McBride's could possibly have that condition worsened. However, Dr. Robert found no material evidence, radiographically or neurologically, to suggest that McBride's condition had, in fact, worsened.
Dynte Moore testified about her close relationship with her grandfather and how she believed, based on his activity level and behavior, he was in good physical health before the accident. She reported that McBride never complained about any back or neck problems, and never did she ever notice him limping or holding his back to indicate a problem. He was a "very active man" before the accident, but Moore described how he was increasingly reluctant to perform physical tasks after the accident.
Moore was questioned about her treatment at the ER on the day of the accident and admitted she did not have neck pain when she was initially seen. Instead she reported pain in her middle and lower back. She also reported that she received a laceration to her forehead, which was sutured, and that her head injurycaused her to experience dizziness. She reported receiving follow up care at New Orleans Health Care by Dr. DeAbate and later with Dr. Hamsa. She first saw Dr. Hamsa in July 2013 but soon left for Bard College in New York and could only schedule visits with Dr. Hamsa when she was home from school. Moore testified that she received a scholarship to play basketball in college, but found she could not play as well as she wanted to play after the accident. She stated that her ability to play had "shifted and changed" and that she was no longer as confident when playing due to her fear of getting hurt. Although she had attended an early college satellite program for Bard College and was able to do the work required, she testified that after the accident, it was difficult to focus and her concentration was no longer as good. Being unable to play basketball well and experiencing difficulty in her academics, she was "red shirted" from the basketball team and sat on the bench.
Moore complained of back and neck discomfort, with the back pain being the worse of the two. Although she had never experienced headaches before the accident, she now reported frequent, recurring headaches, which she indicated were a 5 or 6 on a pain scale with 10 indicating a high degree of pain. She also complained of difficulty with concentration. She stated that her medical bills totaled $11,817, and that she consulted with a plastic surgeon about surgery to minimize or improve the appearance of her forehead scar and was told it would cost an additional $3500. The plastic surgeon indicated surgery may help the scar's appearance, but he could not guarantee improvement. She testified that the area where the scar is located feels numb, but no longer hurts. She reported that she is more critical of her own self-image, particularly since the scar is on her face and visible, and she tries to avoid having her photograph taken. She stated that the scar is the first thing she notices when she looks in the mirror.
In his testimony, McBride described how the other driver went through a red light before hitting his car and that his concern was for the young people who were traveling with him. McBride, born in 1932, is a military veteran who sustained frostbite in the service. He reported that he takes pain medication for the pain in his feet from the frostbite. His wife passed *668 away in 2015 after 50 years of marriage; he has 9 children and "plenty of grandkids" with whom he is close. He described his life before the accident, claiming he was in "tip top" shape, regularly exercising, running, lifting weights, and working. He reported that he regularly lifted 40 pound dumbbells. Before Hurricane Katrina, McBride ran a seafood restaurant business for 40 years with only 6 missed days. After Katrina destroyed his business, he worked as a "house man" at the Hilton for five years. His work at the Hilton included janitorial work, cleaning, and lifting. Before the accident, he picked up his grandchildren after school every day and brought them to their other grandmother. He would then return to pick them up after he left work and would bring them home. At the time of the accident, he was living with his daughter, Alvina, while he was fixing his hurricane-damaged home. He helped his daughter with her children, did all of the grocery shopping, carried bags in from the car, and performed many other physical chores. He reported that he had a strong self-image and did not want others to see him stoop or as incapable of doing physical tasks. He conceded that he had problems with his back before the accident, which he attributed to "arthritis" but said the pain diminished by 90-95% after he was given an ESI (Epidural Steroid Injection). McBride indicated that, immediately after the accident he did not feel that he had many limitations, but as time passed, his condition got worse. He began using a walking stick, then a cane, and now uses a wheelchair due to his back pain. He reported that since the accident, he needs help getting in and out of the tub, he is no longer as involved in the community or with his grandkids' school, and he cannot attend church.
McBride's daughter, Alvina McBride, testified much the same, noting her father worked as a porter at the Hilton (where she also worked as human resources director). She said her father did many physical tasks - and "did anything he was asked to do." Her father was a huge help to her with her children and at home and even in the year or two before the accident, she had noticed no decline in his health. After the accident, he no longer could go walking with her at the levee and could not drive the kids to school or help with the groceries. She described how her father must now use a urinal and that he wraps towels around the doorknobs so he can pull them to open. She claimed that she considered her father her "hero" and that he never complained.
Corroborating her testimony was the testimony of Auburn County ("County"), one of McBride's adult grandsons. County reported that his grandfather was "always moving around" and active until after the accident. He testified that his grandfather has steadily declined, can no longer do many of the physical activities he once did and no longer takes pride in his appearance or in his health.
Appellants' Assignments of Error on Appeal
Award of Damages
Appellants challenge the jury's award of damages to McBride, claiming the award was excessive and erroneous given that McBride failed to prove the nature and extent of any alleged aggravation of his pre-existing condition; and that the jury incorrectly based the award on lay testimony about McBride's pre-existing condition although the medical records contradicted the witnesses' testimony. With regard to the award of damages to Moore, Appellants assert that the damages given for disfigurement were excessive and there was no probative evidence to support Moore's claim for loss of enjoyment of life.
*669 In civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard, "which precludes the setting aside of a district court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety." Hall v. Folger Coffee Co. , 2003-1734, p. 9 (La. 4/14/04), 874 So.2d 90, 98. To reverse the factfinder, "an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous." Detraz v. Lee , 2005-1263, p. 7 (La. 1/17/07), 950 So.2d 557, 561 (citations omitted). "The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently." Id. "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong, even if the reviewing court would have decided the case differently." Id.
With regard to the award of damages by the jury, "[g]eneral damages are awarded based on evidence showing physical pain and suffering, inconvenience, loss of intellectual gratification, or physical enjoyment and other losses of life or lifestyle." Rogers v. State ex rel. Dep't of Transp. & Dev., 2000-1424, p. 12 (La. App. 4 Cir. 3/7/02), 813 So.2d 495, 504-05. The fact finder can also consider a plaintiff's concern for his inability to fulfill family responsibility, the effect on personal esteem, and the mental anguish suffered as a result of the accident. Id. The fact finder also must consider the age of the victim at the time of the accident as a significant factor in the amount of damages awarded. Id.
Appellants argue that, under the facts most favorable to McBride, the accident caused an aggravation of a pre-existing condition. In order for the jury to have concluded that McBride's pre-existing condition was aggravated by the accident, however, Appellants assert that the jury would have had to disregard the testimony of: (1) Dr. Ruth Foster, the emergency room physician to whom Mr. McBride complained of no lower back pain following the accident; (2) Dr. Brian Ogden, who testified that the later MRIs showed nothing that he could relate to the December 3, 2012 accident; (3) Dr. Everett Robert, who testified that the accident had no effect on the progression of Mr. McBride's pre-existing condition; and, (4) the records of Dr. DeAbate documenting that McBride had progressed under his care to such an extent that he had no neck or low back pain by May 1, 2013, five months after the accident. Appellants' also assert that, although there was lay testimony that McBride had little physical trouble before the accident, this testimony is completely contradicted by the documented medical evidence obtained from the V.A.
In Ryan v. Zurich Am. Ins. Co., 2007-2312, p.12 (La. 7/1/08), 988 So.2d 214, 222, the Louisiana Supreme Court stated:
"The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound." Sportsman Store of Lake Charles, Inc. v. Sonitrol Sec. Systems of Calcasieu, Inc., 99-0201 (La. 10/19/99), 748 So.2d 417, 421 (citing Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990) ). "A fact finder may accept or reject the opinion expressed by an expert, in whole or in part." Green [v. K-Mart Corp. , 2003-2495, p. 5 (La. 5/25/04), 874 So.2d 838, 843 ] (citing Lirette, supra ). "The trier of fact may substitute common sense and judgment *670 for that of an expert witness when such a substitution appears warranted on the record as a whole." Id. (Citing Sportsman Store, supra ). Upon review, "[w]here documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact-finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination." Sportsman Store, supra at 421. "But where such factors are not present, and a factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Id.
In their brief, Appellants grossly oversimplify the medical testimony which was offered at trial. While it is true that Dr. Foster indicated that McBride did not complain of back pain when he was seen in the Emergency Room immediately after the accident, she conceded that a victim of a car accident, particularly one McBride's age, could feel very different in the days or weeks after an initial emergency room evaluation. Furthermore, Dr. Foster explained to the jury that it would have been preferable to use an MRI to determine if a soft-tissue or disc injury was present, but that was not ordered in the ER; nor was an x-ray or CT scan ordered of McBride's lumbar region. The jury may have also reasonably found that Dr. Foster's testimony bolstered McBride's contention that the accident had aggravated his pre-existing condition as she indicated that an elderly man with a degenerative joint disease was more vulnerable to injury as a result of trauma.
Likewise, Appellants point only to the portion of Dr. Ogden's testimony where he agreed with Dr. Robert's assessment that nothing in the MRI reports connected the injuries sustained in the auto accident to McBride's current medical condition. However, other parts of Dr. Ogden's testimony did support McBride's claim of an aggravated pre-existing condition. Specifically, Dr. Ogden opined that a CT image taken on the day of the accident would not predict what would happen to the spine as a result of the accident a year or two later. Similar to Dr. Foster, he confirmed that, although the CT images taken in the ER did not indicate that a recent trauma had been sustained, a CT image is limited in its ability to view soft tissue, discs and ligaments. He stated that an MRI would have been preferable. Additionally, Dr. Ogden indicated that sustaining a soft tissue injury could cause a pre-existing degenerative condition to accelerate. When specifically asked whether he would defer to the opinion of the treating orthopedist who determined that it was more probable than not that McBride's pre-existing condition was aggravated by the accident, Dr. Ogden responded that he would defer to that opinion because, "They [the treating physician] have a lot more information than I have."
Conversely, Dr. Robert, an expert for the Appellants, provided the least favorable evidence to McBride. Dr. Robert compared reports from earlier MRI's performed on McBride, both pre- and post- accident, with the MRI images of May 2013 and testified that he found no significant changes. He disagreed with Dr. Hamsa's report assessing McBride's cervical and lower back "bulges" and opined that he found no material evidence based on the images or his neurological assessment of McBride to indicate that McBride's neck and back issues occurred abruptly. Dr. Robert's testimony was not all contrary to McBride's case, however. While he found it unlikely that McBride was asymptomatic *671 before the accident, he did not find it "impossible." He informed the jury (through his video deposition) that McBride had been cooperative with him during the exam and that he did not believe McBride was exaggerating his symptoms, lending credibility to McBride's complaints. He conceded that an individual who suffers from a pre-existing injury could have that condition worsened as a result of a car accident. The jury also heard that Dr. Robert's examination of McBride was a one-time, approximately thirty minute event. The jury may reasonably have given less weight to Dr. Robert's testimony than what they gave to Dr. Hamsa, McBride's treating physician.
With regard to Appellant's contention that the records of Dr. DeAbate did not support McBride, we note that Dr. Robert reviewed the records of Dr. DeAbate before the jury, as Dr. DeAbate did not testify. The jury was thus provided with Dr. Robert's interpretation of Dr. DeAbate's treatment and diagnosis of McBride's condition. The specific report referenced by Appellants is correspondence issued by Dr. DeAbate on May 2, 2013, in which he noted that his physical examination of McBride "at this time" revealed a "full range of motion with no pain." Appellants assert this report shows that, even if McBride's pre-existing condition was aggravated by the accident, the aggravated injury was effectively resolved five months after the accident.
However, the full medical records of Dr. DeAbate were entered into evidence and the specific report of May 2, 2013, also contains some qualifiers. The report indicates that on the date of examination, McBride reported that he was "coming along." The examination revealed many positives, such as the full range of motion, lack of pain, and no tenderness or muscle spasm. However, Dr. DeAbate noted that the MRI was still pending , that McBride was to "continue modality treatments to the affected regions as directed" and "to continue stretching exercises at home daily"(emphasis added). McBride was also instructed to continue taking his medications "as directed." In sum, nothing in the May 2, 2013 report indicates that McBride's injuries had been resolved or that McBride's need for medical treatment had ceased. Additionally, while the jury was informed that Dr. DeAbate's medical report of May 2, 2013, showed improved progression of McBride's neck and back symptoms, other medical reports of Dr. DeAbate indicated that McBride's symptoms were "causally related to the motor vehicle accident ... with a reasonable degree of medical certainty."
The general rule is that the testimony of a treating physician should be accorded greater weight than that of a physician who examines a patient only once or twice. Williams v. Wal-Mart Stores, Inc. , 2000-0863, p.6 (La. App. 4 Cir. 5/16/01), 787 So.2d 1134, 1137 (citing McDonald v. New Orleans Private Patrol , 569 So.2d 106 (La. App. 4 Cir.1990) ). However, the treating physician's testimony is not irrebuttable, and the trier of fact is required to weigh the testimony of all medical witnesses. Id. (citing Celestine v. U.S. Fidelity & Guaranty Co. , 561 So.2d 986, 991 (La. App. 4 Cir.1990) ).
The treating physician in this case was Dr. Hamsa, whose testimony the jury reasonably could have given greater weight. Unlike Dr. Robert, who saw McBride for approximately thirty minutes, Dr. Hamsa treated McBride beginning in July 2013, and continuing up to the time of trial. Dr. Hamsa testified that he had reviewed all of the medical records of McBride, including the records from the V.A., Dr. DeAbate, *672 and from Ochsner Medical Center's ER.[2] He opined that the accident aggravated pre-existing problems and concluded that McBride's need for ongoing medical care, including possible future surgery, was directly related to the accident. Dr. Hamsa noted that McBride's condition had markedly deteriorated since the accident, with McBride initially being able to walk on his own, then requiring the assistance of a walking stick and cane, and more recently requiring a wheelchair for mobility. Dr. Hamsa disagreed with Dr. Robert's opinion that attributed McBride's physical limitations entirely to a pre-existing condition and compared McBride's most recent MRI to prior images, noting increased disc protrusion. Dr. Hamsa opined that the spine had deteriorated since the accident. He agreed, however, with Dr. Robert's conclusion that McBride was in need of surgical decompression and fusion surgery.
The opinions of Dr. Robert and Dr. Hamsa regarding the cause of McBride's present back condition were in direct opposition to Dr. Robert, Appellants' expert, pinning McBride's injury on a pre-existing, yet not worsening, back condition, and Dr. Hamsa firmly finding that McBride suffered from an aggravation of a preexisting condition that was rapidly deteriorating. Dr. Hamsa was aware of the findings of the other medical experts regarding McBride's pre-existing condition but noted that McBride may have been functioning well before the accident as people with such a pre-existing back condition can live normal lives with only occasional discomfort. "Where the testimony of expert witnesses differs, it is the responsibility of the trier of fact to determine which evidence is the most credible." Rando v. Anco Insulations Inc., 2008-1163, p. 30 (La. 5/22/09), 16 So.3d 1065, 1088 (citation omitted). The jury heard the conflicting expert testimony and drew its own reasonable conclusions, apparently crediting the treating physician's opinion. Although Appellants argue that the jury ignored the expert medical testimony and medical documentation and only credited the layperson testimony regarding McBride's physical condition before the accident, there is sufficient medical testimony and evidence of record to reasonably support the jury's determination.
Moreover, the jury was made aware on numerous occasions during the trial that McBride had not informed prior treating physicians of his prior back problems. Whether the motive behind this omission was that McBride, at age 80, was a bad historian, did not think of it as he was not currently experiencing pain, or was intentionally seeking to deceive the medical providers, is a credibility issue best left to the jury. A jury's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon appellate review. Rosell v. ESCO , 549 So.2d 840, 844 (La.1989). McBride's testimony was buttressed by the lay testimony of Moore, Alvina McBride, and County, all of whom strongly supported McBride's claim that he was capable of performing a *673 number of physical tasks prior to the accident and never complained of back or neck pain. All witnesses indicated that McBride was health conscious and in good shape for his age, performed numerous physical tasks without complaint of pain and was a great contributor to his family before the accident. All also reported a deterioration in McBride's physical capabilities after the accident.
Having reviewed the record in its entirety, as this Court is required to do, we find that there is a reasonable factual basis for the jury's finding. Furthermore, based on the record before us, we are unconvinced that the jury's determination is clearly wrong or manifestly erroneous.
Appellants also raise the claim that the jury's award of damages to Moore for disfigurement was excessive and that there was no probative evidence to support Moore's claim for loss of enjoyment of life.
The assessment of "quantum," or the appropriate amount of damages, by a jury is a determination of fact, one entitled to great deference on review. "As such, 'the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact.' " Wainwright v. Fontenot , 2000-492, p. 6 (La. 10/17/00), 774 So.2d 70, 74 (quoting Youn v. Maritime Overseas Corp. , 623 So.2d 1257, 1260 (La. 1993) ). Even when the jury's award of damages is high, "[t]he basic question to be considered is whether the general damage award is so high as to shock the conscience of the reviewing court." In Re Medical Review Panel Bilello v. Alton Ochsner Med. Foundation , 621 So.2d 6, 10 (La. App. 4 Cir. 1993) (citation omitted).
The jury awarded Moore $32,000 for pain and suffering, $50,000 for loss of enjoyment of life, $50,000 for permanent disfigurement as well as $15,317.00 for past and future medical expenses. Appellants challenge the award for permanent disfigurement and for loss of enjoyment of life only. Appellants claim that the damages for Moore's disfigurement are excessive based on the fact that Moore reported the scar is not painful, its appearance could be improved with plastic surgery, and the scar has not left Moore with any serious "emotional or psychological impact."
In Green v. Spriggs , the Third Circuit defined disfigurement as "that which impairs or injures the beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapen, or imperfect, or deforms in some manner." 2005-1105, p.7 (La. App. 3 Cir. 4/26/06), 930 So.2d 1052, 1056 (citations omitted). The photographs of Moore in the record depict that she has a somewhat jagged and angled scar which begins over her inner left eyebrow and extends over the forehead approximately halfway to the hairline. The coloring of the scar is very light or nearly white, easily visible in contrast to Moore's darker complexion. We find the scar meets the Green court's definition of "disfigurement" as it impairs or injures the appearance of Moore's face. Based upon Moore's testimony and the report from the plastic surgeon with whom she consulted, the scar is also permanent in nature, although its appearance could possibly be improved but not eliminated with surgery. At the time of the accident, Moore was just 18 and preparing for college, a time when a young person may be more concerned with her physical appearance. Moore testified:
I notice when people notice it for a little too long. I also may pay more attention to it than other people. I believe that is because it is on my face. I live - I go to college. I am around people always posting pictures online. I am very critical of *674 the photos my friends post of me. So much so if I don't like the photo, I ask them to take it down.
I don't post as many pictures as I used to. I think that is because of my own self-image. That has changed since then. I know that sounds very vane (sic). That is the way I look in the mirror honestly.
Appellants rely on Dr. Hamsa's statement that Moore did not seem to have "hang-ups" about the scar but ignore his testimony that Moore "doesn't like it [the scar] but she has accepted the fact it is there." Dr. Hamsa also explained that Moore has voiced a fear of the local anesthesia by injection that would be required to do a scar revision. "She doesn't even want the classic technique of injection of the scar to shrink it," Dr. Hamsa noted.
Appellants also rely on the trial judge's post-trial statement to the parties that he would not have given Moore that much money for her disfigurement. However, the trial judge's statement is irrelevant, as the jury is the factfinder here. Based upon the testimony offered at trial, the photographs in the record and the medical report of the plastic surgeon, we cannot say that the jury abused its vast discretion.
Appellants further challenge the $50,000 damage award made to Moore for loss of enjoyment of life. La. C.C. art. 2315 authorizes a tort victim to be compensated for the damage sustained as a result of the delict, including those for loss of enjoyment of life, if proven. In McGee v. A C And S, Inc., the Louisiana Supreme Court explained that loss of enjoyment of life is a separate compensable component of general damages that is conceptually distinct from other components of general damages, to wit :
Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury. Loss of enjoyment of life, in comparison, refers to detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury. In contrast to pain and suffering, whether or not a plaintiff experiences a detrimental lifestyle change depends on both the nature and severity of the injury and the lifestyle of the plaintiff prior to the injury.
The First Circuit Court of Appeal, in Matos v. Clarendon Nat'l Ins. Co. , 00-2814, p. 9 (La. App. 1 Cir. 2/15/02), 808 So.2d 841, 848, described the difference between pain and suffering and loss of enjoyment of life as follows:
The same injuries may affect people differently. A quiet, reclusive person with a desk job may have pain and suffering from losing a leg. He would have a permanent disability but he would be able to continue work. He may have some loss of enjoyment of life but not to the extent that person who liked to hike, hunt or play tennis would. A person with a bad back and grown children, who does not do heavy lifting, may not lose as much enjoyment of life as someone with young children who cannot play "horse" or enjoy the squeals of a young child being tossed into the air. Life is much more than simple toil and sometimes the greatest pleasures come from the simplest things.
2005-1036, pp. 5-6 (La. 7/10/06), 933 So.2d 770, 775.
Regarding Moore's lifestyle before the accident, the jury heard her testimony that, at age 18, she was a good student and enrolled in a pre-college program of studies during her senior year of high school. Prior to the accident, Moore also played *675 basketball on a daily basis after school and was at every game. She was awarded a college athletic scholarship as a result of her athletic abilities and was expected to play basketball at Bard College. However, after being hurt in the accident, she lost her confidence on the basketball court and feared getting injured. She also reported that she was an avid reader before the accident and could read all day. After the accident, however, she had difficulty concentrating and could no longer read for long periods of time, particularly in certain positions. She reported that the resulting lack of focus had negatively impacted her grades. As a consequence, she was "red-shirted" and could not play basketball. Her self-esteem suffered due to the scar disfigurement and she no longer liked to have photos taken with her friends. She also finds she is more self-critical of her appearance and sees the scar as soon as she looks in a mirror.
After comparing the lifestyle and activities that Moore engaged in prior to and after the accident, her young age and the damage to her self-esteem, as well as the effect her injuries had on her school and athletic performance, the jury reasonably found that the injuries, which she sustained in the accident, caused a detrimental lifestyle change to Moore. Thus, we cannot find that the jury abused its discretion in its award of damages for loss of enjoyment of life and affirm the jury's award.
Motion for New Trial
Appellants also challenge the trial court's denial of their motion for new trial, finding that the trial court failed to apply the proper standard for a new trial and rejected Appellants' motion for new trial "because he erroneously felt the applicable standard was wrong."
Appellants rely on the colloquy with the trial court at the hearing on Appellants' Motion for JNOV and Motion for New Trial. Appellants concede that the standard for granting a JNOV is a very high one which they could not meet. However, Appellants claim that the motion for new trial filed pursuant to La. C.C.P. arts. 1972 and 1973 is less stringent than the one for the grant of a JNOV, and the trial court improperly applied the statutory requirements.
Before addressing the merits of Appellants' argument, however, Appellees raise a procedural ground which they argue prohibits this Court from addressing Appellants' challenge to the trial court's ruling on the motion for new trial. Whereas Appellants' "Petition for Suspensive Appeal" references both the final judgment issued by the trial court on the merits on February 21, 2017, and the May 17, 2017 Judgment denying the JNOV and/or alternatively the motion for new trial, the Order of Appeal signed by the trial judge only granted a suspensive appeal from the final judgment rendered on February 21, 2017. Because a ruling on a motion for new trial is a non-appealable interlocutory judgment, Appellees argue that ruling cannot properly be reviewed on appeal. Based on controlling precedent, we reject Appellees' argument.
A judgment that does not determine the merits is an interlocutory judgment. La. C.C.P. art. 1841. Interlocutory judgments are not appealable, unless expressly provided by law. La. C.C.P. art. 2083(C). "A judgment denying a motion for new trial is an interlocutory order, not a final appealable judgment." Babineaux v. Univ. Med. Ctr., 2015-292, p. 4 (La. App. 3 Cir. 11/4/15), 177 So.3d 1120, 1123. However, although the denial of a motion for new trial is generally a non-appealable interlocutory judgment, the court may consider interlocutory judgments as part of an unrestricted appeal from a final judgment.
*676 Id. (citing Occidental Properties Ltd. v. Zufle , 2014-494, p. 10, n.10 (La. App. 5 Cir. 11/25/14), 165 So.3d 124, 130, n. 10.) Thus, "[w]hen an appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory judgments prejudicial to him in addition to the review of the final judgment." Id. (citation omitted). Since Appellants' appeal is taken from a final judgment, their claims challenging the denial of the motion for new trial are properly before this Court.
The Louisiana Supreme Court has explained that a motion for a new trial requires a less stringent test than for a JNOV, as a determination regarding a new trial does not deprive the parties of their right to have all disputed issues resolved by a jury. Pitts v. La. Med. Mut. Ins. Co. , 2016-1232, p. 9 (La. 3/15/17), 218 So.3d 58, 65. La. C.C.P. art. 1972 provides the peremptory grounds for a new trial: (1) when the verdict or judgment appears clearly contrary to the law and evidence, (2) when the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial, and (3) when the jury was bribed or has behaved improperly so that impartial justice has not been done. Additionally, La. C.C.P. art. 1973 provides the trial court discretionary authority to grant a new trial "in any case if there is good ground therefor, except as otherwise provided by law." When the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered pursuant to La. C.C.P. art. 1973. Pitts , 2016-1232, p. 9, 218 So.3d at 65.
Based on our review of Appellants' Motion for JNOV or in the Alternative, for New Trial, it appears that Appellants were seeking relief under either La. C.C. P. arts. 1972(1) or 1973. In a motion for new trial under either La. C. C. P. arts. 1972 or 1973, the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury erred in giving too much credence to an unreliable witness. Joseph v. Broussard Rice Mill, Inc. , 2000-0628, pp.14-15 (La. 10/30/00), 772 So.2d 94, 104 (citation omitted). The applicable standard of review in such a matter is whether the trial court abused its discretion. Id.
Appellants focus on isolated language used during the May 5, 2017 hearing on the Motion for JNOV and/or New Trial, in which the court asked Appellees' counsel, "Were you not shocked by that verdict?" The trial judge also stated, "I thought it was a very high verdict" and "I would not have given the lady with the scar that much money or the gentleman with the medical history that was so obvious ... pre-existing condition." However, reading the trial judge's comments as a whole, we do not find any basis to conclude the trial judge applied the wrong standard in considering the motion for new trial. First, it is worth noting that the trial judge's comment that he was shocked by the verdict came within the context of the remainder of his discussion with Appellees' counsel wherein counsel reminded the court that he had requested damages twice the amount of what was given by the jury. To which the judge responded, "I know but you realize that typically when a jury is out for that short time they tend to come back with a zero." The trial judge's comments thus indicate that at least part of his "shock" was due to the short deliberation time of the jury. To the extent that Appellants argue that the trial judge felt restrained from drawing his own inferences and conclusions or making credibility assessments, the transcript of the hearing *677 does not support such a claim. Instead, the trial court acknowledged that there was a difference in opinion between the experts and "the jury was free to accept or reject your IME doctor and they totally rejected him." The trial court then elaborated on his reasoning, making comments that indicated he agreed there was sufficient evidence to support the jury's decision and did not disagree with the jury's credibility assessments:
But the problem I have with your analysis is then I would, in fact, be sitting in the role of the jury on a new trial motion on every case because of your argument. Dr. Hamsa no matter when he thought that it was an aggravation, you crossed him on it. The jury heard it. They chose to believe him even though it was last minute. Even though he agreed with Dr. Robert that he said the patient needed surgery but not because of the accident because of his preexisting conditions.
You are asking me to step from this chair and sit over there and say a rational juror like myself would never have awarded this based upon the inconsistencies of the family and Dr. Hamsa suddenly having an epiphany on the aggravation as opposed to a direct causation.....
The plaintiff may be a wonderful witness like this guy was . He came across as very sympathetic which, of course, you are not supposed to use sympathy but he did demonstrate that his life changed because of this accident . Although the records reflected he had a significant pain level before. There was lay testimony that his lifestyle changed dramatically.
I know your argument is, well, the records do not to reflect that. The records do in a way because you had the records where he is lifting weights. He did not dispute he was exercising. He disputed the nature of the exercise and the amount of weights. There was evidence the jury could have latched on to . As a reasonable juror could have said this guy is a great guy. He did have a remarkable change after the accident even though the medicals do not necessarily support that one hundred percent. There is evidence from Dr. Hamsa that it did (emphasis added).
As we have previously concluded in our discussion regarding the jury's award of damages, there is a reasonable factual basis for the jury's finding that McBride's pre-existing condition was aggravated by the accident, resulting in McBride's presently limited physical condition. As such, we cannot find that the jury's verdict is clearly contrary to the law and evidence, nor is there a basis to conclude that a motion for new trial should have been granted on the basis of a miscarriage of justice. We do not find that the trial court applied an incorrect standard when assessing the motion for new trial and find no abuse of the trial court's discretion in denying the motion for new trial.
Appellees' Assignments of Error on Appeal
Appellees' challenge the trial court's decision to enter a partial directed verdict dismissing McBride's claims for future medical expenses, as well as the court's decision to exclude quotes of surgical costs for future medical procedures from the jury's consideration.
The record shows that, at the end of the Appellees' case, Appellants moved for a partial directed verdict on the Appellees' claim for future medical damages, asserting that no evidence or testimony was presented regarding the need for future medical procedures, nor was much evidence presented regarding the cost of such procedures. The trial court granted the *678 motion for a partial directed verdict and excluded the space from the jury interrogatory form to award future medical expenses, on the basis that there was no evidence presented as to exactly what procedures McBride needed and the cost of such procedures.
Appellees also assert that the trial court erred in failing to admit a letter from a physician (who did not testify), which contained quotes of estimated costs of the surgery that both Dr. Robert and Dr. Hamsa had recommended for McBride. When Appellees moved to enter the document into evidence, Appellants objected since the author of the letter was not listed as a witness, the statement was not listed as an exhibit in the pre-trial order, all deadlines for identifying witnesses and exhibits had passed and Appellants would have no opportunity to challenge the surgery estimates. The trial judge refused to admit the exhibit, finding to do so would be a violation of his pre-trial order, but he allowed Appellees' counsel to examine Dr. Robert and Dr. Hamsa regarding the nature and costs of the procedure. Appellees' counsel did not proffer the excluded quotes of surgical costs and did not elicit testimony from Dr. Hamsa regarding the cost of any future surgery for McBride. During the video deposition of Dr. Robert, however, Appellees' counsel did ask Dr. Robert what the surgery he proposed would cost. Dr. Robert indicated he did not know, as someone else in his office handled such matters. When pressed by Appellee's counsel for a "ballpark figure," Dr. Robert stated that the proposed surgery would cost "under $100,000, I mean, but, you know, over $10,000."
La. C.C.P. art. 1636 allows for a proffer of evidence when the trial court has ruled that evidence inadmissible. In such a situation, "[i]t is incumbent upon the party who contends his evidence was improperly excluded to make a proffer, and if he fails to do so, he cannot contend such exclusion is error." Mazzini v. Strathman , 2013-0555, p. 5 (La. App. 4 Cir. 4/16/14), 140 So.3d 253, 256-57 (citing Grusich v. Grusich , 447 So.2d 93 (La. App. 4 Cir.1984) ). Since Appellees failed to make such a proffer, we cannot find error in the trial court's evidentiary ruling excluding the physician's letter containing quotes of estimated costs of surgery.
With regard to the trial court's ruling granting the partial directed verdict, however, we do find error. The standard of review on appeal for directed verdicts is whether reasonable persons could not reach a contrary verdict under the evidence. Levy v. Lewis , 2016-0551, p. 13 (La. App. 4 Cir. 5/17/17), 219 So.3d 1150, 1158. A directed verdict must be reviewed in the light of the applicable substantive law governing the nonmoving party's claim. See Everhardt v. Louisiana Dep't of Transp. & Dev. , 2007-0981, p. 14 (La. App. 4 Cir. 2/20/08), 978 So.2d 1036, 1047.
The applicable substantive law governing an award of future medical expenses, which is considered a form of special damages, is set forth in Kaiser v. Hardin , 2006-2092, pp. 12-13 (La. 4/11/07), 953 So.2d 802, 810 (citing Guillory v. Insurance Co. of North America , 1996-1084, p. 5 (La. 4/8/97), 692 So.2d 1029, 1032 ). In Kaiser , the Louisiana Supreme Court ruled that, in order to alter a jury's factual conclusions with regard to special damages, including future medical expenses, "an appellate court must satisfy a two-step process based on the record as a whole: There must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong." Id. Moreover, "[f]uture medical expenses must be established with some degree of certainty. Awards will not be made in the absence of *679 medical testimony that they are indicated and setting out their probable cost." Duncan v. Kansas City Southern Railway Co. , 2000-0066, p. 17 (La. 10/30/00), 773 So.2d 670, 685. However, in Stiles v. K-Mart Corp. , 597 So.2d 1012 (La. 1992), the plaintiff proved that he would require future medical treatment, but he did not present expert testimony as to the cost of the treatment. The court of appeal deleted the trial court's award for this item of damages, but the Louisiana Supreme Court reinstated the award, noting:
When the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required. La. Code of Civ. Proc. art. 2164.
Stiles , 597 So.2d at 1013. "Future medicals need not be established with mathematical certainty although a plaintiff must prove that it is more probable than not that expenses will be incurred." Molony v. USAA Property and Casualty Ins. Co. , 1997-1836, pp. 2-3 (La. App. 4 Cir. 3/4/98), 708 So.2d 1220, 1221 (citations omitted). "Although a plaintiff is not required to prove the exact value of the necessary expenses, some evidence to support the award must be contained in the record." Id.
In this case, the trial court granted a partial directed verdict on the basis that no evidence was presented as to exactly what future medical procedure McBride needed and the precise cost of such a procedure. We find that the trial court abused its discretion in finding that reasonable persons could not have reached a verdict in McBride's favor for future medical expenses related to his future surgery needs. The record contains sufficient evidence in the form of expert opinion of McBride's treating physician, Dr. Hamsa and the IME physician, Dr. Robert, that a future surgical procedure, specifically spinal decompression and lumbar fusion, would be needed. Although not exact as to its cost, evidence was also offered from which the jury could have determined, at a minimum, what costs would be incurred. The estimate of the cost for such a surgery can only be based on the evidence of record, which is Dr. Robert's "ballpark" range that it would cost between $10,000 and $100,000 for the surgery to be performed. Pursuant to Stiles , 597 So.2d at 1013, and based upon the medical evidence offered at trial, this Court amends the judgment and sets the amount of $10,000 for future medical expenses in favor of McBride as the reasonable amount that he, more probably than not, will be required to incur. Id.
Accordingly, based on the foregoing, we affirm the jury's verdict and award of damages to Appellees, as amended by this opinion.
AFFIRMED AS AMENDED

Upon admission, the laceration was assessed by a nurse to be approximately 7 cm. However, Dr. Freeto's notes indicate the laceration was repaired and was 3 cm. in length. It is unclear from the record if the 3 cm. length was pre- or post-surgical repair.

Appellants list as an issue (although not as an assignment of error) that the jury's award of general damages to McBride was interdicted by the fact that McBride concealed his prior neck and back issues. Appellants did not brief the issue and therefore the claim is deemed abandoned. Uniform Rules-Courts of Appeal, Rule 2-12.4. We acknowledge, however, that Appellants make the claim on several occasions that McBride did not reveal the extent of his prior back and neck issues and that Dr. Hamsa was unaware of McBride's prior treatment for same until the time of his deposition. Regardless, the jury was made aware that McBride had not given many details of his prior back trouble to medical providers and apparently rejected Appellants' contention that McBride withheld this information in an attempt to conceal his prior medical condition.